USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-1120 UNITED STATES, Appellee, v. HONORIO GONZALEZ-MALDONADO, a/k/a NORI, a/k/a JOHN DOE 94 CR360-3, a/k/a ONORIO GONZALEZ-MALDANDO, Defendant - Appellant. ____________________ No. 96-1296 UNITED STATES, Appellee, v. GERMAN MONTALVO, a/k/a ITO, a/k/a JOHN DOE 94 CR360-2, Defendant - Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. H ctor M. Laffitte, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Coffin, Senior Circuit Judge, ____________________ and Selya, Circuit Judge. _____________ _____________________ Jos A. Pag n-Nieves, by appointment of the Court, with whom ____________________ Jos A. Pag n Nieves Law Offices, was on brief for appellant ___________________________________ Honorio Gonz lez-Maldonado. Judith H. Mizner, with whom Ricardo R. Pesquera-Annexy was _________________ ___________________________ on brief for appellant Germ n Montalvo. Lena Watkins, Attorney, with whom John C. Keeney, Acting _____________ _______________ Assistant Attorney General, Theresa M.B. Van Vliet, Chief, _________________________ Criminal Division, Narcotic and Dangerous Drug Section, U.S. Department of Justice, and Guillermo Gil, Acting United States _____________ Attorney, were on brief for appellee. ____________________ May 30, 1997 ____________________ -2- TORRUELLA, Chief Judge. Appellants Honorio Gonz lez- TORRUELLA, Chief Judge. ___________ Maldonado ("Gonz lez-Maldonado") and German Montalvo ("Montalvo") appeal their convictions on charges of money laundering in violation of 18 U.S.C. 2, 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i) and conspiracy to possess with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. 846. For the reasons stated herein we vacate their ______ convictions and remand to the district court. On appeal from a conviction, we review the facts in the light most favorable to the verdict. See United States v. ___ ______________ Staula, 80 F.3d 596, 599 (1st Cir.), cert. denied, 117 S. Ct. 156 ______ ____________ (1996). On that basis, the jury could have found the following facts. In the spring of 1993, the FBI began a money laundering investigation. An undercover FBI agent, Agent Mart n Su rez, and an informant infiltrated a money laundering organization that worked under the direction of a man known as "Honcho." Honcho communicated to Agent Su rez and the informant that they would be contacted through their pager, by a person using the code "Romero 55." On May 24, 1994, Agent Su rez received a page from Romero 55 and contacted him by phone. Agent Su rez, the informant, and Romero 55 -- who was later identified as Julio Robles-Torres ("Robles") -- arranged to meet the following day, at which time Romero 55 delivered approximately $600,000 to Agent Su rez and the informant. The conversation that took place at the meeting -3- was recorded, although there were periods when the recorder malfunctioned. At trial, the court admitted the taped conversation into evidence over the objection of defense counsel. Agent Su rez testified that during the interrupted portion of the tape, Robles indicated that he had started an individual named "Papo" in "this business" and that Papo had made six million dollars. Agent Su rez testified that, in the context of the conversation, he interpreted "this business" to mean the drug business. The exchange between Agent Su rez and government counsel went as follows: Agent Su rez: I recall that he had mentioned that he had started Papo in this business. He had -- also mentioned that Papo was in the car repair business. Government: Okay. When you say that he started -- he, Robles, had started Papo in that business, what business is he talking about? Agent Su rez: In the drug business. Tr. 2 at 278. During the taped conversation, Robles also stated that he had given a lottery ticket in the amount of $250,000 to a friend of Papo. Agent Su rez testified that drug smugglers buy winning lottery tickets in order to launder money. There was no mention of Montalvo or Gonz lez-Maldonado during the taped conversation. Based on the delivery of $600,000 and the conversation between Agent Su rez and Robles, the government obtained a court -4- order authorizing the interception of communications on Robles' cellular phone. At trial, the government introduced more than sixty of these intercepted calls. The government states that in fifteen of those calls, appellant Montalvo, identified as "Ito," spoke with Robles; and in ten calls, Gonz lez-Maldonado, identified as "Nori," spoke with Robles. On June 27, 1994, FBI Special Agent Daniel Gonz lez intercepted a conversation between Robles and Papo. During that conversation, Robles and Papo referred to "tickets." Agent Gonz lez, over objection, testified that the word "ticket" referred to money. Neither appellant participated in or was mentioned during the call. On June 28, 1994, six conversations were intercepted by police. The jury could have concluded that appellant Montalvo participated in one of these calls. The first call was to appellant Gonz lez-Maldonado at his store, Mazda Fever. Gonz lez-Maldonado indicated that he had four tickets, and Robles said that they could combine their tickets. Based on these calls, another FBI Special Agent, Michael Plichta, set up surveillance at Mazda Fever. He observed Robles arrive in a gray Volvo around 4:00 p.m., on June 28, meet briefly with an unidentified male, and then drive around back, where he remained, out of sight, for twenty minutes. At 4:20 p.m., an individual identified only as "Chepe" called Robles, who stated that he was picking up the tickets at that moment and that he would proceed to deliver them. When Robles departed, he was -5- followed to a Ponderosa restaurant, where he met briefly with two men. Shortly thereafter, the two men were detained and $715,309 was seized from a suitcase and a cardboard box found in their car. The following day, Papo and Robles had three telephone conversations about the seizure, including the question of who would assume responsibility for the lost money. In recorded conversations on July 8, 1994, Robles confirmed with Montalvo and an individual identified as "Gurucho" that Gonz lez-Maldonado had all the tickets. In his conversation with Gurucho, Robles indicated that Gurucho should contact Gonz lez-Maldonado about a delivery. Gonz lez informed Robles that Gurucho had directed them to make a delivery to an individual identified as "Nina" at the Condado Plaza Hotel. On July 9, 1994, the FBI established surveillance at the Condado Plaza Hotel. FBI Special Agent Jane Peltier testified that Robles went to Mazda Fever around 8:30 a.m. Shortly after, he left Mazda Fever and proceeded to the Condado Plaza Hotel parking garage, arriving around 9:00 a.m. Carrying a gray bag, he went to the eighth floor, and then left the hotel empty-handed. FBI agents entered room 825 and recovered the gray bag and seized $243,600 from the safe in the room. At the time of Montalvo's arrest, police seized, among other things, a photocopy of a Puerto Rico lottery check, two pagers, and two notebooks. In addition to Montalvo and Gonz lez- Maldonado, the police arrested Robles. The three were to be -6- tried together until, in March 1995, Robles was found incompetent to stand trial and the case against him was severed. Appellants assert several claims on appeal. We find some of those claims valid, warranting reversal of the convictions. In order to give as much guidance as possible to the district court, we also discuss some of the other claims that are likely to resurface if there is a new trial. I. The Psychiatric Testimony of Dr. Jos Fumero I. The Psychiatric Testimony of Dr. Jos Fumero Appellants argue that the district court erred in excluding the testimony of Dr. Fumero, the psychiatrist who had, at the court's direction, initially examined Robles for competency. This claim includes two distinct arguments. First, appellants claim that the court erred in excluding Dr. Fumero's testimony after defense counsel had relied on an earlier ruling that the testimony would be allowed. Second, appellants assert that the court's decision to exclude Fumero's testimony was based on the mistaken belief that the testimony was offered only to address the issue of Robles' competency as a witness. Appellants contend that the testimony was actually offered to: provide information concerning Robles' medical history and his diagnosed schizophrenia, and the possible ramifications of Robles' illness for evaluation of the evidence to be introduced at trial -- to provide information relevant to whether, as a result of his mental disease or defect Robles was unable to appreciate the nature and quality or wrongfulness of his acts in May-June, 1994; or whether aspects of his illness were relevant to assessing the reliability and meaning of Robles' statements. -7- Brief of Appellant Montalvo, at 17. We deal with each claim in turn. A. Opening Statements A. Opening Statements Prior to trial, defense counsel met with Dr. Fumero, who had conducted the competency examination of Robles. Fumero opined that Robles was suffering froma mental illness at the time of the offenses and that his mental illness resulted in a tendency to exaggerate. Defense counsel informed the court that he intended to have Fumero testify at trial, arguing that Fumero's testimony should be admitted so that the jury could determine the weight to be given to the taped conversations. Tr. 1 at 7. The court stated that it would "let Dr. Fumero testify and then let that go to the jury."1 Tr. 1 at 21. During opening statements, counsel for both defendants made reference to Robles' mental state. Counsel for Gonz lez- Maldonado promised the jury that he would produce a psychiatrist who would testify that a person in Robles' condition "exaggerates, and that everything that he talks about is greater." Tr. 1 at 163. Counsel for Montalvo, in his opening statement, stated: The expert selected by this Court, Dr. Fumero, selected by this Court, will come here, will sit there and will testify that during this conspiracy . . . Mr. Julio Robles-Torres was mentally insane. Therefore, you cannot trust him.  ____________________ 1 Following opening statements, the court reiterated its intent to allow Dr. Fumero to testify. "I said I would allow Dr. Fumero to testify at trial." Tr. 1 at 189. -8- You cannot put much attention to what he's saying because he exaggerates. Tr. 1 at 169. During the presentation of defendants' case, the court reconsidered its earlier decision and decided that Dr. Fumero would not be allowed to testify because the testimony would only go to the issue of Robles' competency as a witness, which is a question for the court, and that evidence of a mental defect does not render testimony inadmissible. See Tr. 8 at 1506. ___ Appellants argue that even if Fumero's testimony was properly excluded, the court committed reversible error by first ruling that it would permit Fumero to testify and then, after the close of the government's case, ruling that his testimony would be excluded. In Anderson v. Butler, 858 F.2d 16 (1st Cir. 1988), ________ ______ defense counsel, in his opening, told the jury that he would call a psychiatrist and a psychologist to show that the defendant had no appreciation of what he had done. Counsel subsequently rested his case without calling the promised doctors, although they were available. On appeal, this court held that the failure to call these witnesses amounted to ineffective assistance of counsel, stating that "little is more damaging than to fail to produce important evidence that had been promised in an opening." Id. at ___ 17. "The first thing the ultimately disappointed jurors would believe, in the absence of some other explanation, would be that the doctors were unwilling, viz., unable, to live up to their billing. This they would not forget." Id. "[T]he jurors' ___ -9- conclusion would remain that impartial experts -- the most qualified witnesses -- would not testify as counsel had said they would; in effect a contradiction of the favorable lay witnesses, much worse than if he had not mentioned the doctors initially." Id. Furthermore, "to promise even a condensed recital of such ___ powerful evidence, and then not produce it, could not be disregarded as harmless. We find it prejudicial as a matter of law." Id. at 19. ___ The case at bar raises similar concerns. The opening statements for the defense included a promise to the jury that a psychiatrist would testify to the effect that Robles exaggerates as a result of his mental illness. Unlike in Anderson, it was ________ the district court that prevented the defense from fulfilling its promise to the jury. Having obtained the assurance of the court that Dr. Fumero would be allowed to testify, defense counsel stated as much to the jury. When the court later changed its mind and ruled that the expert would not be permitted to testify, defendants were unable to produce the promised testimony. Like the jury in Anderson, the jury in this case was ________ likely to infer from defense counsel's failure to call Dr. Fumero that he was unwilling to testify for the defense. Nor was the jury informed of the fact that it was the court's ruling, rather than the defendants' decision, that kept Dr. Fumero off the stand. Although Anderson concerned an ineffective assistance of ________ counsel claim, the principle behind Anderson applies in this ________ case. A defendant's opening statement prepares the jury to hear -10- his case. If the defense fails to produce promised expert testimony that is critical to the defense strategy, a danger arises that the jury will presume that the expert is unwilling to testify and the defense is flawed. That the defendant should suffer this presumption because he relied on a prior ruling of the trial court that the same court later reversed, rather than because of poor judgment on the part of his own counsel, in no way changes the fact that the presumption formed in the minds of the jury is prejudicial. As we did in Anderson, we find that ________ promising to admit this important evidence and then failing to produce it is prejudicial as a matter of law in the circumstances of this case. Following Anderson, therefore, we find that ________ denying defendants the opportunity to have Dr. Fumero testify, in light of the fact that the court's decision on the matter led defense counsel, in their opening remarks, to promise the expert's testimony to the jury, was reversible error. B. The Admissibility of Dr. Fumero's Testimony B. The Admissibility of Dr. Fumero's Testimony Appellants also challenge the district court's ruling that Dr. Fumero's testimony is inadmissible. On appellate review, "[a] district court's decision to admit or exclude expert testimony is entitled to great deference." United States v. ______________ Shay, 57 F.3d 126, 132 (1st Cir. 1995). We will reverse the ____ trial court's decision on this question only if "(1) the district court based the decision on an incorrect legal standard, or (2) we have a 'definite and firm conviction that the court made a -11- clear error of judgment in the conclusion it reached based on a weighing of the relevant factors.'" Id. (citations omitted). ___ Defendants' argument proceeds as follows. Dr. Fumero was a qualified witness within the meaning of Federal Rule of Evidence 702, as the court agreed. Tr. 8 at 1483. He proffered to the court that the symptoms of Robles' mental condition include "verbosity;" "grandeza" ("[h]e has to feel important and the center of attention as part of his . . . fragmented ego needs"), Tr. 8 at 1497; and exaggeration. Because defendants faced criminal charges based largely on recorded conversations involving Robles, and because the government claimed that these conversations demonstrated the existence of a drug conspiracy, the weight placed on the taped conversations by the jury was of paramount importance. Indeed, the defendants' case was founded on the view that the recorded conversations were discussions of legitimate business dealings. If the jury could be convinced that Robles' testimony was unreliable because he had a medical condition that led him to exaggerate, it would be more likely to believe the defense theory that they were involved in legal business activity. The district court ruled that Dr. Fumero would not be allowed to testify on the ground that "the fact that a person may suffer a mental defect or problem does not render his testimony inadmissible." Tr. 8 at 1459. The court stated further that "[y]ou cannot bring a witness and say, well, this man is not telling the truth or he can't tell the truth." Tr. 8 at 1465. -12- The court appears to have understood Dr. Fumero's testimony to be related to the competency of Robles: "What I suggest to you is that we give to the jury a stipulation that Julio Robles had been held not competent to stand trial at this time but that he is being evaluated further." Tr. 8 at 1466. It is well established that a witness' mental state can be relevant to the issue of the witness' credibility. United ______ States v. Butt, 955 F.2d 77, 82 (1st Cir. 1992). The competency ______ ____ of a witness to testify is a determination to be made by the trial judge, but issues of credibility are for the trier of fact. See United States v. Carroll, 105 F.3d 740, 743 (1st Cir. 1997); ___ _____________ _______ United States v. Hyson, 721 F.2d 856, 864 (1st Cir. 1983). _____________ _____ The ability of parties to offer expert testimony on the question of credibility is not, however, unlimited. "[A]n expert's opinion that another witness is lying or telling the truth is ordinarily inadmissible pursuant to Rule 702 because the opinion exceeds the scope of the expert's specialized knowledge and therefore merely informs the jury that it should reach a particular conclusion." Shay, 57 F.3d at 131. On the other ____ hand, "no constitutional provision, law, or rule requires the exclusion of expert testimony simply because it concerns a credibility question." Id. To be admissible under Federal Rule ___ of Evidence 702, a proposed expert witness must: (1) be qualified to testify as an expert by "knowledge, skill, experience, training, or education," Fed. R. Evid. 702; (2) the testimony must concern "scientific, technical, or other -13- specialized knowledge," Fed. R. Evid. 702; and (3) the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Shay, 57 F.3d at ____ 132. In Shay, the defendant, Shay Jr., was convicted of ____ "conspiracy and aiding and abetting an attempt to blow up his father's car." Shay, 57 F.3d at 128. Shortly after the bombing, ____ he told a police officer that "he was sorry about it and wished he could turn back the hands of time." Id. The government ___ argued that this statement was evidence of Shay Jr.'s guilt. As part of his defense, Shay Jr. sought to call Dr. Phillips, a psychiatrist, to testify that Shay Jr. suffered from a mental disorder known as "pseudolog a fant stica." The expert witness was to testify that this illness caused Shay Jr. to fabricate self-aggrandizing lies that would place him at the center of attention. Id. at 129-30. The district court excluded this ___ testimony on the ground that the jury was capable of determining the reliability of Shay Jr.'s statements. The Shay panel held that expert psychiatric testimony ____ can be admitted in appropriate circumstances to establish a witness' "character for truthfulness." Id. at 131. The instant ___ case is governed by Shay, and our analysis follows the one ____ adopted there. Neither party challenges Dr. Fumero's qualifications as an expert. The proffered testimony concerned the mental illness of Robles and its impact on his behavior -- implying that it -14- concerned "scientific, technical or specialized knowledge." The remaining question is whether it would have assisted the trier of fact to understand the evidence or to determine a fact in issue. The question that a court must answer in determining whether a proposed expert's testimony will assist the trier of fact is "whether the untrained layman would be qualified to determine intelligently and to the best degree, the particular issue without enlightenment from those having a special understanding of the subject matter involved." Id. at 132 (internal quotation ___ marks omitted). Dr. Fumero's testimony would have discussed Robles' mental illness. Dr. Fumero would have testified that Robles, as a result of his illness, was prone to exaggeration. Moreover, this case has a unique dimension. Because Robles was incompetent to testify, the jury did not have the usual chance to evaluate his demeanor. Yet, the tapes containing his statements were introduced, and they were damaging to the defense. In light of the fact that the government's case was heavily dependent on Robles' taped conversations, we believe that, in these unusual circumstance, the testimony that he had a mental illness that led to "verbosity," "grandeza," and exaggeration was highly relevant and that an untrained layman would not be qualified to determine intelligently, and to the best degree the weight to place on Robles's recorded statements without enlightenment from Dr. Fumero. The government argues that Dr. Fumero's testimony should be disallowed because the taped conversations featured -15- current actions which were largely corroborated. To the extent that Robles did suffer from the mental illness at issue, however, Dr. Fumero's testimony could be relevant to the credibility of current statements. The defense theory is that Robles exaggerated his situation in statements that he made -- a claim for which Dr. Fumero's testimony is clearly relevant. That the statements were, in the view of the government, accurate, is something for the jury to consider in its deliberations. It goes to the weight to be given to the evidence and is not a reason to exclude Dr. Fumero's testimony. We conclude, therefore, that the district court erred in refusing to allow Dr. Fumero to testify.2 II. The Use of the Government's Transcripts II. The Use of the Government's Transcripts A. The Transcripts A. The Transcripts Defendants also claim that transcripts provided by the government and used by the jury should not have been permitted. The government provided transcripts of the taped conversations to the jury so that when the tape was played, the jury could follow along on the transcripts. The transcripts included quotation marks around certain words that the government claimed were code words used to conceal the illegal nature of the conversations. For example, quotation marks were placed around words such as "ticket," which the government claimed referred to money, and  ____________________ 2 We need not engage in a harmless error analysis at this point because we are reversing and remanding on other grounds, as discussed in the preceding section of this opinion. -16- "accident," which allegedly referred to arrest. Defendants' objection to these transcripts was overruled. This circuit allows the use of transcripts as a jury aid to tape recording playback. See United States v. Carbone, ___ ______________ _______ 798 F.2d 21, 26 (1st Cir. 1986). Where transcripts are used, the judge should, as was done here, "make clear [to the jury] that the tapes, not the transcript, constitute evidence in the case." United States v. Richman, 600 F.2d 286, 295 (1st Cir. 1979). ______________ _______ Furthermore, we have stated that: Even if transcripts are not admitted in evidence, in the sense of being marked as exhibits, they are read and relied on by the jury to follow the playback. They should, therefore, be as accurate as possible. Carbone, 798 F.2d at 27. _______ The quotation marks used in the transcripts submitted to the jury in this case reflect the government's theory of the case. The government does not claim that there is any audible emphasis or other vocal inflection placed on the marked words that is discernible when listening to the tape and failed, both at trial and on appeal, to offer any legitimate explanation for the quotation marks. We hold that the trial court committed erred when it allowed the use of transcripts that contained quotation marks around certain words. It is not enough that the court instructed the jury that only the tapes, and not the transcripts, were evidence. Nor is it enough for the government to subsequently present evidence that the words were code words. -17- The government should not be allowed to bolster its argument by customizing the transcript to reflect its own theory of the case. B. The Agents' Interpretation of the Transcript B. The Agents' Interpretation of the Transcript The next claim advanced by appellants is that the court erred when it allowed FBI agents to interpret the recorded conversations. Appellants' briefs fail to offer detailed descriptions of the incidents to which they object, although Gonz lez-Maldonado's brief cites to seventeen incidents that are generally alleged to represent occasions on which the agents' interpretations went beyond interpretation of code words. Although appellants objected on certain occasions, they failed to object on many of the instances cited in Gonz lez-Maldonado's brief. Although expert testimony is permitted in order to assist the jury in understanding "code-like" conversations in tape recordings, interpretations of clear conversations are not admissible. See United States v. Montas, 41 F.3d 775, 783-84 ___ _____________ ______ (1st Cir. 1994); United States v. Lamattina, 889 F.2d 1191, 1194 _____________ _________ (1st Cir. 1989). Expert testimony on a subject that is well within the bounds of a jury's ordinary experience generally has little probative value. On the other hand, the risk of unfair prejudice is real. By appearing to put the expert's stamp of approval on the government's theory, such testimony might unduly influence the jury's own assessment of the inference that is being urged. Montas, 41 F.3d at 784. ______ -18- We are conscious of the fact that the interpretation of alleged code-words used by the defendants in a complex case such as this may require the expert to make statements about the context in which those words are being used. Nevertheless, we find that in some of the instances cited by appellants, the court erred by allowing FBI agents to comment on clear statements contained on the tapes. Because we are reversing on other grounds, we need not review each alleged transgression. Instead, we offer an example, in the hope that such errors can be avoided if there is another trial. At one point Agent Plichta observed, in reference to one of the recordings, that the participants in a conversation "appeared relieved when they -- when they -- when they discussed the fact that apparently they'd been able to make the delivery of money and nothing happened. They were both relieved and I believe one of them even chuckles a bit about that." Tr. 5 at 848. That the speakers on the tape were, or were not, relieved is for the jury to determine, and the testimony of the agent does not assist them in this effort. III. Spanish Definitions in Jury Instructions III. Spanish Definitions in Jury Instructions Appellant Montalvo claims that the district court erred in its instructions to the jury. Specifically, he alleges that the court included in its definition of the term "willfully" a Spanish translation that is inaccurate. In delivering its instructions, the court stated the following: -19- The word "knowingly," as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident. That is, "knowingly" means in Spanish a sabiendas. ___________ The word "willfully" -- that is voluntariamente in Spanish -- as that _______________ term has been used from time to time in these instructions, means that the act was committed voluntarily and purposely with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law . . . . Now, unlawfully -- in Spanish ilegalmente -- means contrary to law. ___________ Tr. 9 at 1704-05. Montalvo argues that the term voluntariamente is _______________ equivalent to the English term "voluntary" and, therefore, represents only one aspect of willfulness. As the English definition suggests, willfulness also requires that the act be committed purposely and with the intent to do something that the law forbids. See United States v. Yefsky, 994 F.2d 885, 899 (1st ___ _____________ ______ Cir. 1993). We conclude that Montalvo is correct in his assertion that the term voluntariamente means "voluntary." See _______________ ___ The Collins Spanish-English English-Spanish Dictionary (2d ed. 1988). It follows that the use of this term in order to assist jurors, whose predominant language may be Spanish, in understanding the term "willfully" was ill-advised. We need not inquire into the question of whether it is reversible error, however, as we are reversing the judgment on other grounds. -20- We add the following note of caution. Although we do not believe that there should be an absolute rule prohibiting the use of non-English words when instructing the jury, we do believe that this practice is inadvisable and should be discouraged. The English meaning of the word "willfully," for example, is adequately covered by an instruction such as those that have been approved by this court in the past. See, e.g., United States v. ___ ____ _____________ Shadduck, Nos. 95-1395, 95-1396, 96-1342, __ F.3d __, 1997 WL ________ 191877, at *4 (April 24, 1997); Yefsky, 994 F.2d at 899.3 We ______ therefore instruct the district courts to frame instructions in English. IV. The Admission of Evidence IV. The Admission of Evidence A. The Lottery Check A. The Lottery Check At trial, the government admitted into evidence a photocopy of a 1992 lottery check seized from Montalvo at the time of his arrest. The check was in the amount of $250,000. The government introduced the evidence because Robles revealed to the undercover team that he had provided a winning lottery ticket in the amount of $250,000 to a friend of Papo who, the government claimed, was in the drug business. That appellant possessed a check for the exact amount was, the government argued, probative  ____________________ 3 Reasonable proficiency in teh English language is a required qualification for a juror. See 28 U.S.C. 1865(b)(2) & (3); ___ United States v. Aponte-Su rez, 905 F.2d 483, 492 (1st Cir. ______________ _____________ 1990). That juries understand English is also a practical need. The use of English is necessary for the creation of an appellate record which will be read by appellate judges who may not be versant in other languages, and who do not have the benefit of an official translator as is available in district courts. -21- of his involvement in the alleged conspiracy. Furthermore, the government claims that the fact that the check was dated two years before the events described does not change the fact that it was relevant because Papo had worked with Robles for a long time and the check was offered to demonstrate the existence of a conspiracy long before the events of May through July 1994. Appellant Montalvo claims that the check lacked relevance to the case. He claims that "[t]here was no evidence to show that the ticket had come from Robles, that it was purchased with the proceeds of drug transactions or that it evidenced Montalvo's involvement with Robles in drug distribution at some earlier time." Brief of Appellant Montalvo, at 32. In essence, appellant contends that there was nothing to indicate that the check was evidence of any element of any charged offense. We add that, at sentencing, the judge stated, "I don't find a reasonable connection for this case to find by a preponderance of the evidence that the $250,000 lottery ticket that was purchased is part of this conspiracy, and therefore I am excluding it." Transcript of Sentencing, at 10. We review this evidentiary ruling for abuse of discretion. United States v. Brandon, 17 F.3d 409, 443-44 (1st _____________ _______ Cir. 1994). Our review of the testimony fails to reveal any demonstrated connection between the photocopy of the check and the charges brought against defendants. The check was from -22- before the dates at issue in this case and no evidence was put forward to suggest that it was connected to drug transactions, except the general claim by the government that lottery checks were used to launder money. The government argued at trial, however, that the check was relevant to demonstrate the existence of the conspiracy prior to the dates at issue. Given our deferential standard of review, we, therefore, do not find abuse of discretion in this case. Although we might conclude differently if our review were de novo, we do not believe that ________ the court abused its discretion in accepting this argument.4 B. The Notebook Seized During Montalvo's Arrest B. The Notebook Seized During Montalvo's Arrest Appellant Montalvo also objects to the admission of a notebook seized at his home at the time of his arrest. The government's expert witness, FBI Agent Carl Jensen, testified that "[t]he submitted documents are in a format of records which could be maintained in connection with an illicit drug distribution business." Tr. 7 at 1203. Appellant argues that the notebook had no probative value because there was no indication as to when or by whom the notations had been made, there were no initials or names, no dollar signs or terminology attached to the numbers, and no correlation between the numbers in the notebook and the amounts involved in the offenses charged. Our review is, once again, on an abuse of discretion standard and we do not find such abuse here. The government  ____________________ 4 Our failure to find abuse of discretion, of course, should not be taken as determinative of whether the lottery check should be admitted in a future trial. -23- advanced the testimony of an expert witness who testified that the notebook appeared to be a record of drug transactions; and that it "lack[ed] the class characteristics [one] would expect to find with legitimate type business records," Tr. 228 at 1203- 1204; and that the apparent prices in the notebook were consistent with the prices of kilogram quantities of cocaine in central Florida, where appellant Montalvo lived during the time frame of these events. Based on this testimony, we do not find that the court abused its discretion in admitting the notebook into evidence. The trial court was in a much better position than this court to assess the relevance of the notebook. The decision to admit the notebook was within the sound discretion of the district court. C. Notebook Seized from Robles C. Notebook Seized from Robles Appellant Montalvo next claims error in the admission of a notebook seized from Robles' home on the ground that it was not adequately authenticated as required by Federal Rules of Evidence 901.5 We review for abuse of discretion. United States _____________ v. Echeverri, 982 F.2d 675, 679 (1st Cir. 1993). _________  ____________________ 5 Rule 901 provides, in part: The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponents claim. Fed. R. Evid. 901(a). -24- We must determine whether "there is sufficient threshold proof that the document is what its proponent claims it to be." Id. at 679. The Federal Rules of Evidence take a ___ flexible approach to this issue. The document's authenticity may be confirmed by "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Id. The notebook was found, ___ along with Robles' identification card, in a briefcase in Robles' room. Such circumstantial evidence is permitted in order to authenticate the item. Id. at 680. We do not find that the ___ district court abused its discretion in admitting this document into evidence.6 V. Sufficiency of the Evidence Claims V. Sufficiency of the Evidence Claims Appellants seek to have their convictions reversed and the case dismissed on the grounds that there was insufficient evidence, as a matter of law, to convict them. In reviewing such a claim, we must determine if, "after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the case." United ______ States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994). "[W]e do ______ _______ not pass on the credibility of the witnesses, nor do we demand that the government disprove every hypothesis consistent with the  ____________________ 6 We repeat our earlier statement that our conclusion that there was no abuse of discretion should not be taken as a ruling on the admissibility of the evidence on remand. -25- defendant's innocence." United States v. Spinney, 65 F.3d 231, _____________ _______ 234 (1st Cir. 1995) (citations omitted). In order to prove the conspiracy charge, the government was required to prove that appellants: intended to agree and that they intended to commit the substantive criminal offense [distribution of cocaine] which was the object of their unlawful agreement. Due to the clandestine nature of criminal conspiracies, the law recognizes that the illegal agreement may be either 'express or tacit' and that a 'common purpose and plan may be inferred from a development and collocation of circumstances.' United States v. S nchez, 917 F.2d 607, 610 (1st Cir. 1990) ______________ _______ (internal citations omitted). To prove the money laundering charge, the government had to demonstrate that defendants: (a)(1) knowing that the property involved in a financial transaction represent[ed] the proceeds of some form of unlawful activity, conduct[ed] or attempt[ed] to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity (A)(i) with the intent to promote the carrying on of specified unlawful activity; or . . . . (B)knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. 18 U.S.C. 1956(a)(1). The convictions in this case rested on conversations between appellants and Robles, as well as other conversations -26- involving Robles. It was for the jury to determine whether these conversations related to legitimate business dealings or illegal drug transactions. Viewing the evidence in the light most amiable to the government, we conclude that a reasonable jury could have concluded that the conversations in the tapes concerned drug related transactions. With respect to Montalvo, the jury could also have inferred guilt from the notebooks and the lottery check put into evidence. With respect to Gonz lez- Maldonado, evidence was presented that transactions took place at his place of business and a reasonable jury could have concluded that the taped conversations demonstrated his involvement in the conspiracy and the money laundering. These conversations could be interpreted to have dealt with cocaine that had been damaged in shipment, cocaine stored at his place of business, and cocaine to be imported in the future. Such inferences were permissible and, therefore, we find the sufficiency of the evidence claim to be without merit. VI. Sentencing VI. Sentencing Finally, appellant Montalvo claims error in both the court's calculation of the quantity of drugs for which he should be held responsible and the court's role-in-the-offense determination. Because we are remanding the case, we need not reach this issue. In the event of a new trial, with different testimony and different arguments, the trial court will be in a better position than we are today to determine the quantity of drugs for which appellants, if convicted, should be held -27- responsible, and to make an evaluation of defendants' role in the offense. VII. Conclusion VII. Conclusion For the reasons stated herein, we vacate appellants' vacate ______ convictions and remand the case to the district court for further remand ______ proceedings consistent with this opinion. -28-