USCA1 Opinion

 

 [NOT FOR PUBLICATION--NOT TO BE CITED AS PRECEDENT]
 
 United States Court of Appeals
 For the First Circuit

No. 96-2093

 UNITED STATES,
 Appellee,

 v.

 NICOLAS VALLADARES-QUINTANA,
 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF PUERTO RICO

 [Hon. Juan M. Perez-Gimenez, U.S. District Judge]

 Before

 Torruella, Chief Judge,
 Campbell, Senior Circuit Judge,
 and Stahl, Circuit Judge.
 

 Jorge E. Rivera-Ortiz on brief for appellant.
 John C. Keeney, Acting Assistant Attorney General, Criminal
Division, U.S. Department of Justice, with whom Theresa M.B. Van
Vliet, Chief, Narcotic and Dangerous Drug Section, Criminal
Division, U.S. Department of Justice, Lena D. Watkins, Associate
Deputy Chief, Criminal Division, U.S. Department of Justice, Gary
DiBianco, Trial Attorney, Narcotic and Dangerous Drug Section,
Criminal Division, U.S. Department of Justice, and Susana Lorenzo-
Giguere, Trial Attorney, Narcotic and Dangerous Drug Section,
Criminal Division, U.S. Department of Justice, were on brief for
appellee.
 
 __________________________
 
 July 30, 1998
 __________________________ CAMPBELL, Senior Circuit Judge. Nicolas Valladares-
Quintana ("Valladares") appeals from his conviction in the district
court on one count of money laundering. He alleges that the
district court abused its discretion by excluding his proffer of
exculpatory evidence, that the evidence was insufficient to
establish his guilt, and that the court erred when it calculated
his sentence. After consideration, we affirm.

 I.
 As appropriate upon an appeal from a criminal conviction,
we state the facts in the light most favorable to the jury verdict. 
See United States v. Gonzalez-Maldonado, 115 F.3d 9, 12 (1st Cir.
1997). The jury could have found the following.
 As part of a federal undercover operation, FBI Special
Agent Martin Suarez infiltrated a money-laundering organization in
Puerto Rico. That organization received large quantities of United
States currency generated by cocaine distribution, exchanged the
currency for monetary instruments in small denominations, and
arranged for transportation of those instruments to Columbia.
 Beginning in late 1993, Agent Suarez laundered money for
an organization code-named "Roberto Diez." Several deliveries of
drug money from Roberto Diez were made to Agent Suarez. One such
delivery was made by Reynaldo Escobar-Mosquera ("Escobar"), who was
indicted but testified for the government at Valladares's trial.
 The transaction that involved Valladares took place on
January 17, 1994. On that date, someone from Roberto Diez paged
Agent Suarez. Agent Suarez responded by calling a cellular phone
rented to Valladares. Agent Suarez and Valladares set up a meeting
at which Roberto Diez was to deliver money to Agent Suarez. Agent
Suarez proceeded to the agreed meeting place, where he saw Escobar
and a then-unidentified man sitting in a black Jeep Cherokee. 
After Agent Suarez and Escobar exchanged greetings from their
vehicles, the second man got out of the Cherokee carrying a box. 
The second man placed the box, which contained roughly $190,000, on
the rear passenger seat of Agent Suarez's car. At that time, Agent
Suarez looked directly at the second man from a distance of
approximately three or four feet. The second man then got back
into the Cherokee and drove off with Escobar. Several weeks later,
when Agent Suarez reviewed the driver's license photographs of
persons associated with Escobar's company, "Hacienda Remini," he
identified Valladares as having been the second man at the January
17 encounter.
 The January 17 delivery was observed by at least two
other witnesses, agents on an FBI surveillance team: Special Agent
Adalberto Rivera and Special Agent Luis Fraticelli. Agent Rivera
was parked near the black Jeep Cherokee. He photographed the
transaction with a zoom lens from a distance of 100 to 150 feet,
and these photographs were introduced into evidence. Valladares
appeared in two of the photographs. At one point, Escobar and
Valladares came within fifty feet of Agent Rivera. Agent
Fraticelli observed Valladares not only at the transaction but
afterwards when he followed the black Jeep Cherokee. Both agents
picked out Valladares's driver's license photo from among several
others.
 Valladares and three co-defendants were named in a second
superseding indictment returned on September 27, 1995. Valladares
was charged with two counts: conspiracy to distribute cocaine and
money laundering. At trial, the government presented the testimony
of Escobar as well as of Agents Suarez, Rivera and Fraticelli. All
four witnesses testified that Valladares had participated in the
January 17 delivery. Further, Escobar testified that he,
Valladares, and a man named Miguel Torres, distributed cocaine in
Puerto Rico. He stated that the three men started a corporation
called "Hacienda Remini," a name derived from the first name of
each founder, to launder the money produced by their drug
distribution. According to Escobar, Valladares knew the details of
and participated fully in the drug and money-laundering operation.
 Valladares's defense was that he was unaware of Escobar's
criminal activities and that the federal agents were mistaken when
they identified him as a participant at the January 17 delivery. 
Valladares, and two defense witnesses, testified that Valladares
engaged in only legitimate business and that, to the best of their
knowledge, Escobar had accrued his wealth by gambling. To show
that he had been misidentified, Valladares was prepared to testify
that a United States Customs Service investigation report (the
"USCS Report") had incorrectly identified Valladares as the
individual who delivered $950,000 in currency during a November 25,
1993 money transfer. Valladares contended that, since the Customs
Service used the same identification methodology as did the FBI,
its earlier mistaken identification of him cast doubt on his
present identification. In his opening statement, Valladares's
attorney promised the jury that he would present evidence regarding
the earlier misidentification. The court, however, excluded the
USCS Report as lacking in relevance, reasoning that the federal
agents had identified Valladares based on their first-hand
observations of him during the January 17 transaction.
 Valladares was convicted of money laundering and
acquitted of the drug conspiracy charge. The Pre-Sentence Report
("PSR") recommended a base offense level of twenty. On top of that
base, the PSR recommended several enhancements. The first was a
three-level increase because Valladares knew that the laundered
funds arose from unlawful activity. See U.S.S.G. 2S1.1(b)(1). 
Second, the PSR recommended a two-level increase for obstruction of
justice because, it concluded, Valladares had committed perjury by
denying at trial any involvement in the criminal enterprise. SeeU.S.S.G. 3C1.1. Lastly, the PSR included a one-level increase
because Valladares laundered more than $100,000 but less than
$200,000. See U.S.S.G. 2S1.1(b)(2). The PSR, therefore,
recommended a total offense level of twenty-six. In addition, the
PSR indicated a fine range running from a minimum of $12,500 to a
maximum of $500,000. See U.S.S.G. 5E1.2(c)(3), 5E1.2(c)(4).
 Valladares objected in the district court to the two-
level adjustment for obstruction of justice and to the inclusion of
acquitted conduct in the PSR. He did not, however, object to the
three-level increase based on his knowledge of the criminal nature
of the laundered funds. Valladares sought an offense level of
twenty-four, two levels lower than the PSR's recommendation. The
district court overruled Valladares's objections, sentenced him to
seventy-eight months in prison, and fined him $12,500. Valladares
appealed.

 II.
A. Exclusion of the USCS Report.
 Valladares argues on appeal that the court's exclusion of
the USCS Report was an abuse of discretion that prevented him from
presenting the "core" of his defense to the jury and violated his
Sixth Amendment rights. We review a court's exclusion of evidence
for abuse of discretion. See United States v. Brandon, 17 F.3d
409, 444 (1st Cir. 1994). Even if a lower court abuses its
discretion, we will affirm unless the error affected the
defendant's substantial rights. See Fed. R. Evid. 103(a). In a
direct criminal appeal implicating constitutional rights, we will
affirm if the government shows there was no reasonable possibility
that the excluded evidence would have affected the jury verdict,
i.e. that any error was "harmless beyond a reasonable doubt." 
United States v. Mulinelli-Navas, 111 F.3d 983, 992 (1st Cir. 1997)
(quoting Chapman v. California, 386 U.S. 18, 24 (1967)) (internal
quotation marks omitted).
 Valladares contends that the USCS Report would reveal
that he was mis-described as a participant in a November 25 money-
laundering transaction in Puerto Rico. Actually, Valladares says
he was in Miami at the time. The district court excluded the
report because of its lack of relevance, stating that Valladares
had to establish that the agents "were mistaken because
[Valladares] wasn't there [on January 17,] not because two months
prior other agents made a mistake[] as to his identity." Cf. 2
Joseph M. McLaughlin, Weinstein's Federal Evidence 
401.04[2][e][ii], at 401-29 (2d ed. 1997) ("Evidence, though
otherwise relevant, may be excluded because it is too remote in
space or time from the proposition being proved."). When ruling on
remote evidence, the judge must "weigh its probative value against
the dangers of unfairness, confusion, and undue expenditure of time
on collateral issues." Id.
 For a variety of reasons, we see no abuse of discretion
in the exclusion of the USCS Report. First, even if it had
revealed an earlier mistaken identification, we doubt its
relevance. Cf. Jordan v. Ducharme, 983 F.2d 933, 938 (9th Cir.
1993) (holding that a defendant's Sixth Amendment rights were not
violated by the exclusion of evidence "that some person, not the
witnesses in court, had mistakenly identified [the defendant] as
the robber in other crimes for which he was not being tried").
 Moreover, even supposing arguendo that a
misidentification made two months earlier has probative value to
disprove a subsequent identification made by a different agent in
a different governmental agency, the USCS Report does not show that
agents mistakenly placed Valladares at the scene on November 25. 
The USCS Report makes reference to the fact that the pagers used to
facilitate the November deal were rented to Valladares: this did
not necessarily indicate that Valladares was physically present at
the November 25 exchange in Puerto Rico. The participants were
described only as "two white hispanic males, approximately 45 to 50
years old." Hence, the USCS Report failed to support even the
questionable point asserted by the defense.
 Valladares contends that the USCS Report had relevance
because the government was planning to produce its author to
testify that Valladares participated in the November 25, 1993
incident. There is simply no record support for this assertion. 
The government denies any such intention and, in any case, no such
witness was called.
 The USCS Report, in brief, fails even the most basic test
of logical relevance: it does not make a later misidentification
any more or less likely than it would be otherwise. See Fed. R.
Evid. 401 (noting that the minimum requirement for admissibility is
that a piece of evidence have a "tendency to make the existence of
any fact that is of consequence to the determination of the action
more probable or less probable than it would be without the
evidence"). Lacking relevance, the report was not admissible,
see Fed. R. Evid. 402 ("Evidence which is not relevant is not
admissible.").
 Obviously, the exclusion of immaterial evidence did not
violate Valladares's constitutional rights. See Taylor, 484 U.S.
at 410 ("The accused does not have an unfettered right to offer
testimony that is incompetent, privileged, or otherwise
inadmissible under standard rules of evidence."); United States v.
Rodriguez Cortes, 949 F.2d 532, 546 (1st Cir. 1991) (finding
harmless error).
B. Sufficiency of the Evidence.
 Valladares next argues that the evidence against him was
insufficient, as a matter of law, to support his conviction for
money laundering. When a defendant brings a sufficiency challenge,
"our task is to determine whether any rational jury, taking the
evidence in its totality and in the light most flattering to the
government, could have found appellant guilty beyond a reasonable
doubt." United States v. Zannino, 895 F.2d 1, 9 (1st Cir. 1990). 
In making this inquiry, we resolve all credibility questions in
favor of the verdict. See United States v. Batista-Polanco, 927
F.2d 14, 17 (1st Cir. 1991).
 To prove the money-laundering charge, the government had
to show beyond a reasonable doubt that Valladares, 
 knowing that the property involved in a
 financial transaction represents the proceeds
 of some form of unlawful activity, conduct[ed]
 or attempt[ed] to conduct such a financial
 transaction which in fact involv[ed] the
 proceeds of specified illegal activity 

 (B) knowing that the transaction [was]
 designed in whole or in part 

 (i) to conceal or disguise the nature,
 the location, the source, the
 ownership, or the control of the
 proceeds of specified unlawful
 activity; . . . .
18 U.S.C. 1956(a)(1); see also Gonzalez-Maldonado, 115 F.3d at
20-21. The term "financial transaction," as used in 1956(a)(1),
includes only dealings that affect "interstate or foreign
commerce," or that involve "the use of a financial institution
which is engaged in, or the activities of which affect, interstate
or foreign commerce in any way or degree." 18 U.S.C. 1956(c)(4).
 The record does not bear out Valladares's contention that
the government failed to show that the January 17 transaction
implicated interstate or foreign commerce. Both Agent Suarez and
another FBI Agent named Siverio testified that the money they
"laundered" was sent to Columbia. Agent Suarez stated under oath
that he had sent approximately twenty million dollars out of the
country over the years of his undercover investigation. The
January 17 transaction was merely one more delivery in the series
of FBI deals. In light of the fact that 1956(a)(1) requires that
a transaction have only a de minimis effect on interstate commerce,
see United States v. Peay, 972 F.2d 71, 74 (4th Cir. 1992), a
reasonable jury could have concluded that the government met its
burden of showing the requisite nexus to interstate commerce.
 Valladares also argues that his acquittal on the
conspiracy count implies that the government did not prove beyond
a reasonable doubt that he knew of the illicit nature of the
laundered funds or even that the money represented proceeds from a
specified unlawful activity. When reviewing the sufficiency of the
evidence, the only question before this court is whether the
evidence at trial could have supported the conviction made. SeeZannino, 895 F.2d at 9. Acquittal on one count of a multi-count
indictment is not a factor in this inquiry; sufficiency-of-the-
evidence review "should be independent of the jury's determination
that evidence on another count was sufficient." United States v.
Powell, 469 U.S. 57, 67 (1984). We do not give weight to an
acquittal even where verdicts are logically inconsistent because
such verdicts might reflect only that the jury acquitted "through
mistake, compromise, or lenity." Id.
 As part of its case, the government presented four
witnesses who testified regarding Valladares's participation in the
January 17 transaction. The witnesses placed that transaction in
the context of many similar dealings, all of which had the goal of
funneling to Columbia money illicitly obtained from cocaine
distribution. When Valladares dropped the money into Agent
Suarez's car, he said, "This is for Flaco," a Columbian supplier of
cocaine. Further, Escobar stated under oath that he and Valladares
were partners who, for several years, obtained drugs from Columbia,
distributed those drugs, and collected money for them. On several
occasions, Escobar and Valladares stored drugs at their home. 
Escobar testified as to Valladares's many telephone calls
discussing drug and money-laundering transactions and the
government played tapes of those calls at trial. The record amply
provides a basis for a jury to conclude that the proceeds were the
fruit of drug-related activity and that Valladares knew that fact.
 Valladares further contends the government failed to show
that he knew the transactions were designed to conceal or disguise
the nature of the money with the aim of converting the fruits of
criminal enterprise into less detectable forms. But the government
met its burden here as well. A reasonable jury could conclude,
from the evidence presented, that Valladares knew of the necessity
for secrecy. Escobar testified that he and Valladares kept their
drug money hidden in the trunk of their car during the day and
slept with it at night. They did not deposit it in the bank,
Escobar testified, for fear of immediate arrest. In addition,
Valladares took elaborate precautions to make sure that the January
17 transaction was not discovered. In his telephone call on that
day and calls on other days, he used code words designed to confuse
anyone who might be listening in. These actions support a finding
that Valladares intended to conceal the source of the $190,000 that
he delivered to Agent Suarez.
 In sum, the record contains sufficient evidence to
support the jury's guilty verdict.
C. Two-level Enhancement for Obstruction of Justice.
 Valladares assails the court's imposition of a two-level
sentence enhancement for obstruction of justice. See U.S.S.G. 
3C1.1. (increasing by two the offense level of a defendant who
"willfully obstructed or impeded, or attempted to obstruct or
impede, the administration of justice during the investigation,
prosecution, or sentencing of the instant offense."). Perjury may
be such an obstruction of justice. See U.S.S.G. 3C1.1 comment
(n.3(b)) (stating that the enhancement is triggered by "committing,
suborning, or attempting to suborn perjury"); United States v.
Dunnigan, 507 U.S. 87, 98 (1993) ("Upon a proper determination that
the accused has committed perjury at trial, an enhancement of
sentence is required by the Sentencing Guidelines [ 3C1.1]."). 
The court found that Valladares perjured himself by denying at
trial under oath his presence and participation in the January 17
transaction. That finding must be supported by a preponderance of
the evidence, see United States v. Clark, 84 F.3d 506, 509 (1st
Cir. 1996), and we review it only for clear error, see United
States v. McKeeve, 131 F.3d 1, 15 (1st Cir. 1997); Batista-Polanco,
927 F.2d at 22.
 The district court's finding that Valladares perjured
himself has ample support. Valladares testified unequivocally and
under oath that he had no involvement in the January 17 transaction
and was misidentified as having taken part in it. However,
Valladares's presence at the delivery was photographed. He was
observed on that day by three federal officers and a co-defendant,
all of whom gave sworn testimony as to his presence and involvement
in the transaction. In these circumstances, a finding of perjury
was not clear error.
 Valladares argues that the district court improperly
based its enhancement for perjury on only the jury verdict and
failed to make the findings suggested by the Supreme Court in
United States v. Dunnigan, 507 U.S. 87 (1993). In Dunnigan, the
Court stated that, when a court imposes a sentence enhancement for
perjury, "it is preferable for a district court to address each
element of the alleged perjury in a separate and clear finding." 
See id. at 95. Specific findings, the Court explained, protect
against sentence enhancement based merely on the fact that a
defendant's testimony was inconsistent with a guilty verdict. 
See id. (observing that not all testimony at odds with the verdict
was necessarily false).
 We do not agree that the court abdicated its duty to make
an independent inquiry into Valladares's testimony. It referred to
the federal perjury statute and made an express finding of perjury. 
The court identified the testimony upon which it was basing the
enhancement and referred explicitly to Dunnigan, noting that
Valladares had a "[c]onstitutional right to testify on his own
behalf but not to provide intentional falsehoods."
 It is not fatal that the court did not make express
findings as to each of the elements of perjury. The Dunnigan Court
explained that a "determination that enhancement is required is
sufficient . . . [provided] the court makes a finding of an
obstruction of, or impediment to, justice that encompasses all of
the factual predicates for a finding of perjury." Dunnigan, 507
U.S. at 95. We have added that "[a] sentencing court . . . is not
required to address each element of perjury in a separate and clear
finding." United States v. Matiz, 14 F.3d 79, 84 (1st Cir. 1994). 
The court's discussion of the two-level enhancement and finding of
perjury was, in all the circumstances, sufficient.
 Valladares criticizes one particular statement that the
court made: "the jury returned a guilty verdict against the
defendant which clearly establishes that his testimony was not
considered truthful nor was it the result of confusion, mistake or
faulty memory." To hold that a guilty verdict, without more,
implies that a defendant's exculpatory testimony was false could be
troubling in some cases. See Dunnigan, 507 U.S. at 95 (noting that
a defendant's "testimony may be truthful, but the jury may
nonetheless find the testimony insufficient to excuse criminal
liability or prove lack of intent"). In a case like this, however,
where the defendant categorically denied being present during the
criminal transaction, the verdict provides a valid yardstick by
which to measure the truth of the defendant's testimony. If the
jury believed Valladares was not present on January 17, it would
have had to acquit. Valladares's conviction, if it implies
anything at all, shows that the jury thought Valladares
participated in the January 17 transaction. Since his presence 
directly contradicts his sworn testimony, the court's remark was
not improper in the circumstances of this case. We conclude that
the district court's findings were sufficient to support its two-
level enhancement pursuant to 3C1.1.
D. Three-Level Enhancement for Knowledge of Criminal
 Activity.
 For the first time, Valladares also challenges on appeal
the district court's three-level enhancement under U.S.S.G. 
2S1.1(b)(1), which increases an offense level if the defendant
"knew or believed that the [laundered] funds were the proceeds of
an unlawful activity involving the manufacture, importation, or
distribution of narcotics or other controlled substances." 
U.S.S.G. 2S1.1(b)(1).
 Valladares did not object in the district court to the
three-level enhancement. He challenged "the inclusion in the
Presentence Report of the offense conduct set forth from Pages 3 to
Paragraph 2 at 7," which included background information on the
drug syndicate and the government's investigation, but he did not
object either to the three level enhancement or to the facts
supporting that enhancement on pages ten and eleven of the PSR. In
fact, Valladares's attorney told the sentencing court that his
objection was designed to allow "only so much [information about
the drug-related activity as] . . . would be necessary to sustain
any finding that the three level increase." Further, the offense
level that Valladares recommended in his statement of objections to
sentencing included the three-level enhancement.
 A defendant who fails to raise an objection in the
sentencing court waives his ability to do so on appeal, except in
extraordinary circumstances. See United States v. Benjamin, 30
F.3d 196, 197 (1st Cir. 1994) (stating that a sentencing challenge
should not "be addressed for the first time on appeal"). Thus, we
may reverse Valladares's enhancement under U.S.S.G. 2S1.1(b)(1)
only if it constituted "plain error." See id. In order to meet
that standard, Valladares must prove: (i) a reviewable error
occurred during sentencing; (ii) the error was clear or obvious;
and (iii) the error affected his "'substantial rights,' which in
most cases means that the defendant must make a specific showing
that the error probably affected his sentence." United States v.
Olivier-Diaz, 13 F.3d 1, 5 (1st Cir. 1993).
 Valladares sketches several brief arguments, but falls
far short of the mark. First, he points out a minor inconsistency
in the government's case: the government's closing referred to a
telephone call between Agent Suarez and Valladares on January 17,
but Agent Suarez testified that he did not talk to anyone other
than Escobar on that date. As neither the PSR nor the sentencing
court relied on this bit of testimony, we cannot discern its import
and Valladares does not elaborate.
 Second, Valladares repeats his earlier argument that the
evidence was not sufficient to support a finding that he knew or
believed the money that he laundered was the fruit of criminal
labor. We have already rejected this argument in the context of
sufficiency of the evidence, but note in addition that the PSR
alone pointed to sufficient evidence to support this enhancement. 
The PSR made reference to Escobar's testimony that Valladares had
assisted him "countless times in the delivery of multi-thousands of
dollars for payment of the drug load in Miami, Florida." In
addition, the PSR noted that approximately 100 kilograms of cocaine
were stored at Valladares's home just prior to the January 17
transaction. Valladares cannot challenge these facts before us
because he failed to do so below. See Benjamin, 30 F.3d at 197
("[A] defendant may not challenge the findings in his PSR if he has
failed to object to that report in the district court."). These
findings alone provide solid support for the court's three-level
enhancement.
 Finally, Valladares suggests that the court's enhancement
is inconsistent with his acquittal on the only drug-related count
of the indictment against him. As noted above, we will not
scrutinize an acquittal in an attempt to discern its meaning. Seesupra. In addition, the standard of proof at sentencing 
preponderance of the evidence is substantially lower than the
"beyond a reasonable doubt" standard used at trial. We have said
in the past, and reaffirm today, that a court may rely on acquitted
conduct at the sentencing phase if the conduct meets the lower
standard of proof used at sentencing. See United States v. Ovalle-
Marquez, 36 F.3d 212, 223 (1st Cir. 1994) (noting that an acquittal
"does not mean, however, that the court could not consider that
conduct as 'relevant conduct' [for sentencing purposes]"); United
States v. Carrozza, 4 F.3d 70, 80 (1st Cir. 1993) ("Relevant
conduct increases a defendant's sentence, sometimes very
significantly, despite the fact that it was not charged in an
indictment and even despite the fact that a jury may have acquitted
the defendant for that precise conduct." (citation omitted)). 
After having reviewed the evidence, we are convinced that
Valladares's knowledge of Escobar's drug business was sufficiently
established to support a sentence enhancement. Thus, we conclude
that the enhancement for criminal knowledge under 2S1.1(b)(1) was
not plain error.
E. Amount and Calculation of the Fine.
 Although Valladares purports to challenge the amount of
his fine, his brief is devoid of argument. It is well settled that
"issues adverted to in a perfunctory manner, unaccompanied by some
effort at developed argumentation, are deemed waived." Zannino,
895 F.2d at 16. Accordingly, Valladares has waived contest of his
fine.
 Affirmed.