This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-36734**

**CHARLES MILLER and CATHIE MILLER,**

 Plaintiffs-Appellants,

v.

**NEW MEXICO HEART INSTITUTE, PA, and PRESBYTERIAN HEALTHCARE SERVICES,**

 Defendants-Appellees.

**No. A-1-CA-37289**

**CHARLES MILLER and CATHIE MILLER,**

 Plaintiffs-Appellees,

v.

**NEW MEXICO HEART INSTITUTE, PA,**

 Defendant-Appellant,

and

**PRESBYTERIAN HEALTHCARE SERVICES,**

 Defendant.

**No. A-1-CA-37304**

**CHARLES MILLER and CATHIE MILLER,**

Plaintiffs-Appellees,

v.

**NEW MEXICO HEART INSTITUTE, PA,**

Defendant,

and

**PRESBYTERIAN HEALTHCARE SERVICES,**

Defendant-Appellant.

**APPEALS FROM THE DISTRICT COURT OF TAOS COUNTY**
**Sarah C. Backus, District Judge**

Law Office of James H. Wood, PC
James H. Wood
Theresa V. Hacsi
Thomas G. Wood
Albuquerque, NM

for Charles Miller and Cathie Miller

Hinkle Shanor LLP
Dana S. Hardy
Jeremy Ian Martin
Santa Fe, NM
Kathleen M. Wilson
Hari-Amrit Khalsa
Albuquerque, NM

for New Mexico Heart Institute, PA

The Melendres Law Firm, PC
Walter J. Melendres
Santa Fe, NM
Leonard Law Office, LLC
Keitha A. Leonard
Tesuque, NM

for Presbyterian Healthcare Services

# MEMORANDUM OPINION

**VANZI, Judge.**

**{1}**     The memorandum opinion filed in this case on August 23, 2019, is hereby withdrawn, and this opinion is substituted in its place.

**{2}**     After he suffered an infection after open-heart surgery, Plaintiff Charles Miller, together with Plaintiff Cathie Miller, his wife, (collectively, Plaintiffs) brought a medical malpractice action against Presbyterian Healthcare Services (PHS) and New Mexico Heart Institute (NMHI), the surgeon's employer (collectively, Defendants). Plaintiffs alleged that the surgeon was negligent in managing his diabetes before surgery and that he failed to delay surgery because both he and Defendants had a financial interest in the surgery. At the completion of Plaintiffs' case, the district court directed a verdict in favor of PHS and, after trial, a jury found in favor of NMHI. The district court first granted Defendants' request for costs, then, on Plaintiffs' motion, reconsidered and denied the requests. All three parties appealed, and we consolidated the appeals for review. We affirm.

## Background

**{3}**     The parties agree on the following essential facts leading to suit. In 2013, an NMHI cardiologist diagnosed Miller with aortic stenosis, otherwise known as narrowing of the aortic valve. The treatment for aortic stenosis is replacement of the aortic valve through open-heart surgery. Miller is also diabetic. Diabetes is diagnosed when a patient's fasting glucose levels exceed the normal range, which is between 60 to 100 mg/dl. High glucose levels increase the risk of infection after surgery.

**{4}**     NMHI scheduled Miller to meet with Dr. Richard Gerety, a surgeon employed by NMHI, on January 31, 2013, with surgery to follow the next day (February 1, 2013) at PHS's hospital in Albuquerque. At the initial meeting, Dr. Gerety assessed Miller for surgery and, knowing Miller was a diabetic, ordered a blood test. The blood test showed Miller's glucose level was 268 mg/dl. Dr. Gerety performed surgery on Miller the next day, as had been scheduled. After the surgery, Dr. Gerety asked an endocrinologist to assess Miller. The endocrinologist noted that Miller's "diabetes has been poorly controlled with a HgbA1c of 8.63 during this admission."

**{5}**     PHS discharged Miller in stable condition and he returned to his home in Taos. In early March, however, Miller was flown by helicopter back to Presbyterian Hospital in Albuquerque, where he was re-admitted for severe sepsis due to an infection in his surgical wound. Miller remained in the hospital for 67 days: he received multiple blood transfusions, was intubated for eleven days, had four surgeries, was on a ventilator, and had parts of his breastbone removed because of necrosis.

**{6}**     Plaintiffs filed a medical malpractice complaint against Defendants alleging that Dr. Gerety negligently failed to consider and control Miller's glucose level or to

otherwise manage Miller's diabetes before surgery, and that his failure to do so or delay surgery resulted in Miller's infection. They also alleged that Defendants "placed money or profits over patient care and patient safety" and breached their duty to avoid unreasonable risks to their patients by "failing to maintain policies, practices, and protocols to [(1)] effectively safeguard patients against the risk of infection [and (2)] monitor and follow-up with high-risk patients like . . . Miller[.]" Plaintiffs also asserted that Defendants negligently "allow[ed] and encourag[ed] Dr. Gerety to operate on . . . Miller when he did." One important premise of Plaintiffs' suit is that Dr. Gerety should have postponed Miller's heart surgery until his diabetes was better controlled but did not do so because he, as well as Defendants, had a financial interest in the surgery going forward on February 1, 2013. This position was based largely on PHS's assignment to NMHI of certain blocks of time in its surgery suites and on testimony that a failure to use the assigned "block time" may result in a reduction of future block time. The parties disputed whether Miller's surgery occurred during an assigned block time at all and whether Dr. Gerety and Defendants were motivated by their financial interests to proceed to surgery in spite of Miller's glucose level.

**{7}**     The parties engaged in vigorous motions practice and discovery, the rulings on which give rise to most of Plaintiffs' arguments on appeal. The district court granted summary judgment on several issues and dismissed PHS by directed verdict. The jury heard the remaining claims against NMHI in a six-day trial, after which it found in favor of NMHI. After trial, Defendants moved for an award of their costs and the district court granted their motions. However, after a motion for reconsideration by Plaintiffs, the district court reversed its earlier ruling.

**{8}**     All three parties appealed. Plaintiffs argue that the district court erred in its rulings before and during trial as well as on summary judgment and directed verdicts. Defendants argue that the district court erroneously reversed its ruling as to costs. We consolidated all three appeals for review. The facts relevant to each of the parties' arguments are included in our discussion.

**Discussion**

**I.      Plaintiffs' Appeal**

**{9}**     We begin by addressing Plaintiffs' appeal. Plaintiffs argue that the district court erred in its rulings as to discovery motions, jury selection, summary judgment, and certain evidence at trial, and in its grant of directed verdicts at the close of Plaintiffs' case. They also assert that, even if these errors do not rise to reversible error, they constitute cumulative error when considered together. We consider each group of arguments in turn.

**A.      Discovery Rulings**

**{10}**    "Although the rules favor the allowance of liberal pretrial discovery, the trial court is vested with discretion in determining whether to limit discovery." *DeTevis v. Aragon*,

1986-NMCA-105, ¶ 10, 104 N.M. 793, 727 P.2d 558 (citation omitted). Hence, we review the district court's discovery rulings only for an abuse of that broad discretion. *N.M. State Inv. Council v. Weinstein*, 2016-NMCA-069, ¶ 41, 382 P.3d 923. Plaintiffs assert that the district court improperly (1) denied their motions to compel discovery, (2) interpreted and applied the Review Organization Immunity Act (ROIA), §§ 41-9-1 to -7 (1979, as amended through 2011), and (3) granted a motion for protective order as to a Rule 1-030(B)(6) NMRA deposition.

**{11}**    First, Plaintiffs argue that the district court "abused its discretion when it denied Plaintiffs' motions to compel" discovery as to Defendants' "financial motives." Plaintiffs' characterization of the district court's ruling is misleading. In fact, the district court *granted* Plaintiffs' motions to compel in large part and ordered Defendants to supplement their responses to Plaintiffs' interrogatories pertaining to their finances. Given the district court's ruling, we interpret Plaintiffs' argument to focus on the district court's rulings as to two specific interrogatories highlighted in Plaintiffs' brief. In spite of the district court's order compelling supplemental answers as to the cost of maintaining and staffing an operating room, the costs associated with cancelled surgeries, and the revenue obtained from Dr. Gerety's surgeries, Plaintiffs argue that the district court erred by failing to compel Defendants "to identify persons with knowledge of the block times arrangement or related finances." However, Plaintiffs do not explain how the denial of this request adversely affected them in light of the other discovery they obtained and, therefore, present no argument for review. "We decline to review such an undeveloped argument." *Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076.

**{12}**    Second, Plaintiffs argue that the district court erroneously denied their motion to compel discovery of four incident reports prepared by PHS's risk management department. In response to Plaintiffs' request for documents related to any investigation into Miller's surgery and subsequent infection, PHS identified four potentially responsive documents, but also stated that the ROIA protected the documents from disclosure. The district court reviewed the reports in camera and denied Plaintiffs' motion to compel, stating,

> [A]ll of the documents reviewed *in camera* were generated solely for peer review. Further, the [c]ourt FINDS that none of the documents are critical or relevant to Plaintiff[s'] case. The [c]ourt also reviewed[] in camera[] items identified by Defendant as being immune from disclosure on the ground of work-product. The [c]ourt has reviewed the identified documents in camera and FINDS that the identified documents are identified as confidential work product documents generated for quality control/improvement at PHS and appear to the [c]ourt to be such. None of the documents reviewed appear to be relevant to Plaintiffs' causes of action against Defendants.

*See Sw. Cmty. Health Servs. v. Smith*, 1988-NMSC-035, ¶ 17, 107 N.M. 196, 755 P.2d 40 (stating that, after a party seeking discovery demonstrates the relevance of the

information sought, the party opposing disclosure under the ROIA bears the burden "to prove that the data or information was generated exclusively for peer review and for no other purpose, and that opinions were formed exclusively as a result of peer review deliberations"). Plaintiffs argue that PHS failed to show that the documents were "generated exclusively for peer review and for no other purpose" and that disclosure is required because the evidence "is critical to the cause of action." We decline to reach Plaintiffs' argument because the documents at issue are not in the record. Consequently, we cannot assess whether the district court's findings are supported by the evidence or if it otherwise abused its discretion. *See State v. Sacoman*, 1988-NMSC-077, ¶ 27, 107 N.M. 588, 762 P.2d 250 ("Because the [pertinent] records were not designated as part of the exhibits for this appeal, they are not before this Court for review to determine if the trial court correctly denied access to them."); *Sedillo v. N.M. Dep't of Pub. Safety*, 2007-NMCA-002, ¶ 21, 140 N.M. 858, 149 P.3d 955 ("It is the burden of the appellant to bring up a record sufficient for review of the issues he or she raises on appeal." (alteration, internal quotation marks, and citation omitted)).

**{13}** Third, Plaintiffs argue that the district court "did not apply the correct law when it granted [NMHI's] motion[] for protective order[]" pertaining to depositions under Rule 1-030(B)(6). The ruling at issue has a convoluted history. In October 2016, Plaintiffs issued a notice of Rule 1-030(B)(6) deposition of Dr. Gerety seeking information related to his compensation, assigned block times, NMHI's management of block times, revenues from surgeries, and losses from cancelled surgeries, among other things. NMHI sought a protective order, arguing that the topics to be covered were overly broad, that it had not agreed to produce Dr. Gerety as a Rule 1-030(B)(6) witness, and that the information sought was the subject of objections pending before the district court. It also stated that the information regarding block times Plaintiffs sought was not within NMHI's possession. However, after Plaintiffs withdrew their deposition notice, NMHI also withdrew its motion for a protective order.

**{14}** Approximately three months before trial, in May 2017, Plaintiffs issued an amended notice of Rule 1-030(B)(6) deposition listing forty-three topics, including Dr. Gerety's compensation, revenue from Dr. Gerety's surgeries, cancelled surgeries and costs incurred for cancellations, and block times allocated to Dr. Gerety. NMHI again sought a protective order, and the district court held a hearing on the motion in July 2017, roughly one month before trial was set to begin. Meanwhile, the district court granted in part Plaintiffs' motion to compel at a hearing on June 26, 2017. The information sought in Plaintiffs' Rule 1-030(B)(6) notice overlaps substantially with that sought in Plaintiffs' motion to compel. At the conclusion of the July 2017 hearing, the district court granted the motion for protective order, stating that it found that "all of these things that have been requested [in the Rule 1-030(B)(6) deposition] could have been obtained or probably have been obtained through other discovery processes." It observed that Plaintiffs could have sought the district court's assistance in resolving Defendants' objections to Plaintiffs' interrogatories or depositions, and that some in fact had been resolved. It also noted the impending trial date and described Plaintiffs' notice of deposition as "kind of an ambush" that put Defendants "in a very . . . bad position."

**{15}** On appeal, Plaintiffs present a single argument: that the district court failed to find that there was good cause for a protective order and that, in the absence of such a finding, a protective order is improper. We discern no error in the district court's ruling. Rule 1-026(C) NMRA provides that "[u]pon motion by any party or interested person for good cause, the court may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense[.]" Despite the fact that neither NMHI nor the district court used the phrase "good cause," the district court's statements indicate that it found that the requested deposition would pose an "undue burden or expense" on NMHI. Given the substantial overlap between the order compelling NMHI to supplement its responses to Plaintiffs' requests and the timing of Plaintiffs' Rule 1-030(B)(6) notice, we conclude that the district court did not abuse its discretion in granting NMHI's motion for protective order. *See Does I through III v. Roman Catholic Church of Archdiocese of Santa Fe, Inc.*, 1996-NMCA-094, ¶ 13, 122 N.M. 307, 924 P.2d 273 ("[T]he district court has broad discretion in determining whether good cause exists[.]"); *cf.* Rule 1-026(B)(2) (permitting the district court to limit discovery if the discovery sought is "unreasonably cumulative," the party "seeking discovery has had ample opportunity . . . to obtain the information sought" or the "burden or expense of the propose discovery outweighs its likely benefit").

## B.     Rulings Pertaining to Jury Selection

**{16}** Plaintiffs assert that the district court erred by denying their motion in limine to treat NMHI and PHS as "one side" during jury selection and at trial. They maintain that "[d]uplicative and cumulative questioning by each Defendant is inherently prejudicial and contrary to Rule 1-040(C)[(3) NMRA]" and that the district court improperly permitted "both PHS and NMHI to exercise five jury strikes even though their interests were not diverse[,]" contrary to Rule 1-038(E) NMRA. Plaintiffs do not cite any specific instance in which cross-examination by Defendants was duplicative.

**{17}** Rule 1-040(C)(3) provides that "[o]nly one counsel on a side may examine or cross-examine the same witness unless otherwise ordered by the court[.]" Plaintiffs argue that both Defendants are on the same "side" and that the district court should not have permitted both NMHI and PHS to question each witness. They argue that the language of Rule 1-040(C)(3) evinces the Legislature's intent[1] to limit cross-examination when there are multiple parties on one "side" of the lawsuit. However, the concluding phrase "unless otherwise ordered by the court" indicates that, even if the intent of the rule is  to limit duplicative questioning by each defendant, the intent of the rule also is to afford the district court the discretion to modify the rule as appropriate. *Cf. In re of Estate of Greig*, 1988-NMCA-037, ¶ 12, 107 N.M. 227, 755 P.2d 71 (noting that "[t]here would have been no need to add the language 'unless otherwise ordered by the court' [to the statute at issue] had the [L]egislature wished to restrict the trial court's discretion" (alteration omitted)). Here, the district court specifically advised Plaintiffs, "if you believe

---

1 Rule 1-040(C)(3) is a Supreme Court rule, not a statute enacted by the Legislature. But we interpret Supreme Court rules "in the same manner that we approach the interpretation of legislative enactments, by seeking to determine the underlying intent." *H-B-S P'ship v. Aircoa Hosp. Servs., Inc.*, 2008-NMCA-013, ¶ 5, 143 N.M. 404, 176 P.3d 1136.

. . . that there is any attempted time wasting [by Defendants' cross-examination], you can always approach, and we can talk about it if anybody is attempting to keep you from being able to put your case on" and advised Defendants that their examinations should not be duplicative or cumulative. The district court did not abuse its discretion in this regard.

**{18}** Rule 1-038(E) provides as follows:

> When there are two or more parties defendant, or parties plaintiff, they will exercise their peremptory challenges jointly. . . . However, if the relief sought by or against the parties on the same side of a civil case differs, or if their interests are diverse, . . . the court shall allow each such party on that side of the suit . . . five peremptory challenges if the case is to be tried before a jury of twelve.

**{19}** To determine whether the parties on the same side of the suit are diverse, the district court may consider "(1) whether the parties employed the same attorneys; (2) whether separate answers were filed; (3) whether the parties' interests were antagonistic; and, (4) in a negligence claim, whether different independent acts of negligence are alleged in a suit governed by comparative negligence." *Gallegos v. Citizens Ins. Agency*, 1989-NMSC-055, ¶ 42, 108 N.M. 722, 779 P.2d 99 (internal quotation marks and citation omitted). Again, our review is only for an abuse of discretion. *See id.*

**{20}** On appeal, Plaintiffs' entire argument on this point is that "Defendants made no showing that they . . . [had] diverse interests" and that Defendants could not have been adverse to each other because NMHI's counsel was representing PHS in another matter. Plaintiffs do not address the arguments or facts set forth by Defendants in the district court, how those facts fail to satisfy the test in *Gallegos*, or why it was an abuse of discretion for the district court to decide otherwise. We therefore decline to address this argument further. *See Headley*, 2005-NMCA-045, ¶ 15.

## C.    Summary Judgment

**{21}** In the next group of arguments, Plaintiffs contend that the district court erred in granting three motions for summary judgment. "[S]ummary judgment may be proper when the moving party has met its initial burden of establishing a prima facie case for summary judgment." *Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 10, 148 N.M. 713, 242 P.3d 280 (internal quotation marks and citation omitted). The movant may establish a prima facie case by adducing "such evidence as is sufficient in law to raise a presumption of fact or establish the fact in question unless rebutted." *Id.* (internal quotation marks and citation omitted). If the movant makes a prima facie showing, "the burden shifts to the non-movant to demonstrate the existence of specific evidentiary facts which would require trial on the merits." *Id.* (internal quotation marks and citation omitted). The non-movant's burden is to "adduce evidence to justify a trial on the issues"; it may not rest on the allegations in the complaint nor simply assert that facts

might exist. *Id.* (internal quotation marks and citation omitted). "We resolve all reasonable inferences in favor of the party opposing summary judgment, and we view the pleadings, affidavits, depositions, answers to interrogatories, and admissions in the light most favorable to a trial on the merits." *Madrid v. Brinker Rest. Corp.*, 2016-NMSC-003, ¶ 16, 363 P.3d 1197. Although summary judgment is viewed with disfavor in New Mexico, *id.*, summary judgment is appropriate only when inferences drawn from the evidence are reasonable. *Romero*, 2010-NMSC-035, ¶ 10. An inference "is not a supposition or a conjecture, but is a logical deduction from facts proved and guess work is not a substitute therefor." *Id.* (internal quotation marks and citation omitted). We review the district court's grant or denial of summary judgment de novo. *Id*. ¶ 7.

### 1. NMHI's Motion for Summary Judgment

**{22}** Plaintiffs argue that the district court erred by granting summary judgment to NMHI on Plaintiffs' claims that NMHI was negligent. In their complaint, Plaintiffs alleged that

> NMHI . . . : (A) failed to have safeguards in place to prevent surgeons like Dr. Gerety from performing heart surgery on patients with a high risk of post-operative infection; (B) failed to have policies and procedures in place to ensure that surgeons like Dr. Gerety did not perform "open heart" surgery on patients with a high risk of developing post-operative infection; (C) failed to train its staff on recognizing patients at risk of post-operative infection; (D) failed to prevent and to train its staff to prevent "open heart" surgery on patients at risk of developing a post-operative infection; (E) improperly and negligently allowed Dr. Gerety to operate on . . . Miller and to operate on . . . Miller when he did; (F) negligently credentialed Dr. Gerety; and (G) negligently supervised Dr. Gerety's care and treatment of . . . Miller.

They also alleged that "NMHI . . . placed money or profits over patient care and patient safety." In the district court, NMHI argued that "[s]ummary judgment . . . is proper because Plaintiffs have failed to disclose the expert testimony necessary to support their position that NMHI [was] medically or professionally negligent or caused any alleged injuries or damages to Plaintiff." It also argued that summary judgment was proper because "no evidence has been adduced to support such claims." In response, Plaintiffs argued that their claims against NMHI were "ordinary negligence" claims such that expert testimony was not required. Plaintiffs also argued that, because NMHI had refused to respond to discovery requests that would reveal evidence to rebut the summary judgment motion, the district court "should allow Plaintiffs to obtain the requested discovery in order to fully respond to" NMHI's summary judgment motion. *See* Rule 1-056(F) NMRA.

**{23}** We first address Plaintiffs' argument regarding discovery under Rule 1-056(F), beginning with the procedural background against which the district court heard NMHI's motion for summary judgment. In an affidavit attached to Plaintiffs' response, Plaintiffs'

counsel stated that the information sought in Plaintiffs' motion to compel and Rule 1-030(B)(6) deposition was needed in order to respond to the summary judgment motion. Plaintiffs filed this affidavit and their Rule 1-056(F) request one day *after* the hearing on Plaintiffs' motion to compel discovery on June 26, 2017, during which the district court granted that motion in large part. The district court then granted NMHI's motion for protective order at a hearing on July 6, 2017, precluding Plaintiffs' Rule 1-030(B)(6) deposition. Thus, as of the July 26, 2017 hearing on NMHI's motion for summary judgment, the district court had verbally ruled on both discovery motions, although it had not yet filed written orders. The fact that the district court had ruled on both discovery motions may explain why Plaintiffs did not pursue the need for discovery in the hearing on NMHI's motion for summary judgment. At any rate, Plaintiffs did not mention the need for discovery in order to rebut NMHI's motion, arguing instead that their claims could be proven without expert testimony and that the evidence in hand was sufficient to demonstrate a genuine issue of material fact. Nor did Plaintiffs request a continuation of the hearing pending receipt of NMHI's supplemented discovery. Consequently, because the district court did not rule on Plaintiffs' argument regarding discovery needed to rebut the summary judgment motion, this issue was not preserved for appeal. *See Crutchfield v. N.M. Dep't of Taxation & Revenue*, 2005-NMCA-022, ¶ 14, 137 N.M. 26, 106 P.3d 1273 ("To preserve error for review, a party must fairly invoke a ruling of the district court on the same grounds argued in this Court.").

**{24}**   As to their substantive arguments, Plaintiffs argue that expert testimony was not required because their claims sound in ordinary negligence, not medical negligence. They also argue that, assuming expert testimony was required, the testimony of their experts was sufficient to prevail over a motion for summary judgment. The first question before us is, therefore, whether expert testimony was required to prove Plaintiffs' claims against NMHI.

**{25}**   Plaintiffs' complaint included multiple allegedly negligent acts by NMHI. However, in their response to NMHI's motion, Plaintiffs discussed only NMHI's alleged failure to enact policies, NMHI's block times scheduling policy, and NMHI's failure to require Dr. Gerety to communicate with the surgical nurse before Miller's surgery. Moreover, on appeal, Plaintiffs present argument only as to the first two claims. Consequently, we too address summary judgment only as to those two claims, beginning with Plaintiffs' allegations regarding NMHI's policies or lack thereof. On appeal, Plaintiffs frame this claim broadly, arguing that it is based on NMHI's failure to implement any measures to ensure quality patient care and stating that "[a] jury can use ordinary knowledge to know that NMHI should have some minimum standards for patient quality[.]" However, both the complaint and Plaintiffs' response to NMHI's summary judgment motion focused the claim much more narrowly on NMHI's failure to enact specific policies to guide Dr. Gerety on "safe pre-operative glucose levels and white blood count levels." We agree with the district court that expert testimony was necessary for this claim.

**{26}**   Generally, expert testimony is required in medical malpractice cases "to establish (1) the standard of care, treatment, and information by which the actions of the [medical provider] are to be judged; (2) the manner in which [it] measures up to the standard, and

(3) whether [its] alleged acts were the proximate cause of the injuries complained of." *Henning v. Parsons*, 1980-NMCA-131, ¶ 9, 95 N.M. 454, 623 P.2d 574. However, expert testimony is not required in cases alleging ordinary negligence: "Where the matter is potentially susceptible to the common knowledge of the jury, expert testimony is not necessary to establish that the hospital's conduct was negligent." Rule 13-1119A NMRA, comm. cmt.; *see Richter v. Presbyterian Healthcare Servs.*, 2014-NMCA-056, ¶ 24, 326 P.3d 50 ("[W]hether a claim involves ordinary negligence or medical malpractice is a fact-dependent inquiry."). We apply a functional test to determine whether expert testimony is required. *Richter*, 2014-NMCA-056, ¶¶ 22, 25. Under this test, "[i]f the act [alleged to be negligent] involves the use of specialized knowledge or skill to make a judgment call as to the appropriate thing to do or not do, expert testimony will likely be needed to assess the resultant act or failure to act. If not, expert testimony is not required." *Id.* ¶ 22.

**{27}** The premise underlying Plaintiffs' argument is that a lay jury can determine whether the standard of care requires policies or guidelines for pre-surgical assessment of patients for diabetes and infection by cardiothoracic surgeons. We disagree. The necessity of guidelines on these highly specific medical topics depends on the risks involved, the number and nature of the factors to be considered per patient, the variability of those factors, the existence of other policies, and the qualifications and training of the people applying such policies. In other words, whether the policies at issue here are within the standard of care requires specialized knowledge and is not "susceptible to the common knowledge of the jury." Rule 13-1119A, comm. cmt.; *see Grassie v. Roswell Hosp. Corp.*, 2011-NMCA-024, ¶ 80, 150 N.M. 283, 258 P.3d 1075 ("[U]nless a hospital's negligence is obvious, a plaintiff must produce expert testimony to establish that the hospital deviated from an accepted standard of care and that the deviation was a substantial factor in causing the harm to the plaintiff[.]" (quoting *Welsh v. Bulger*, 698 A.2d 581, 585 (Pa. 1997); *cf. Richter*, 2014-NMCA-056, ¶ 27 (discussing an out-of-state case in which the court distinguished between "the failure to institute policies and procedures"—which required expert testimony—and "inadequacies" in the ministerial task of reporting test results, which did not).

**{28}** To the extent Plaintiffs argue that their experts' testimony was sufficient to raise a question of fact precluding summary judgment on this claim, we disagree. As Plaintiffs state, their experts' "specialized opinions . . . discuss the sufficiency of care required to operate safely on a patient[.]" Plaintiffs assert that this testimony "was sufficient to educate the jury on the type of standards to which NMHI should hold its surgeons[.]" We are unpersuaded. These opinions go to whether Dr. Gerety was negligent in deciding to go forward with Miller's surgery. They do not address whether NMHI should have implemented policies to guide that decision.

**{29}** We turn to Plaintiffs' claim that NMHI was negligent in using PHS's block times to schedule surgeries because that approach created a financial disincentive to postpone surgeries even when medically necessary. This claim rests on Plaintiffs' allegation that "Dr. Gerety and PHS did not reschedule the surgery because they did not want to lose the time slot for financial reasons." We need not determine whether this claim falls

within ordinary or medical negligence because, in their only argument on this issue, Plaintiffs state that their expert testified that "it was likely Dr. Gerety's decision to proceed to surgery had been caused by pressure from the hospital to utilize the time slot[.]" The expert's full testimony was as follows.

> [Dr. Gerety] operated the next day, and which can only make me think that—I mean, my institution and things I know, that the hospital did not want to lose that slot for financial reasons. And I bet if that was looked into, that could probably be substantiated, and so they did the surgery and [Dr. Gerety] didn't even know anything about [Miller's test results]. And if he did know something about [the results], I would hope that he would have canceled the surgery, even if there was pressure to fill that spot. But I don't know.

Even viewing this evidence in the light most favorable to Plaintiffs and assuming it expresses an opinion relevant to *NMHI*'s financial interests,[2] it is pure speculation. The expert acknowledged as much by stating, "if that was looked into, that could probably be substantiated." He even concludes by stating, "But I don't know." "The presence of a material issue of fact cannot be based on speculation." *Duran v. N.M. Monitored Treatment Program*, 2000-NMCA-023, ¶ 28, 128 N.M. 659, 996 P.2d 922; *see Ciup v. Chevron U.S.A., Inc.*, 1996-NMSC-062, ¶ 7, 122 N.M. 537, 928 P.2d 263 (stating that the party opposing summary judgment "must come forward and establish with admissible evidence that a genuine issue of fact exists"). As Plaintiffs present no other argument on this issue, we conclude that the district court did not err in granting summary judgment to NMHI on this issue.

## 2. PHS's Motions for Summary Judgment

{30} Plaintiffs argue that the district court erred in granting summary judgment to PHS on two specific issues. Plaintiffs' briefing unnecessarily confuses the issues by failing to distinguish between the two motions and the district court's rulings on them. Disentangling the motions and Plaintiffs' arguments reveals that, although PHS's financial motives and the use of block times are related, PHS's motions for summary judgment addressed discrete issues and the district court treated them separately.

{31} The first motion (the financial motives motion) addressed "Plaintiffs' claim that PHS was financially motivated to permit . . . Miller's surgery to occur on February 1, 2013, and not to have cancelled said surgery." PHS sought summary judgment to the effect that its financial motives were immaterial because it was Dr. Gerety, not PHS, who made the decision to proceed with Miller's surgery. The district court granted the motion after a hearing. Plaintiffs' argument in the brief in chief as to the financial motives motion rests on what Plaintiffs call the district court's "repeated reversals." But the district court did not reverse its ruling as to PHS's financial motives motion. In their reply brief, in an effort to demonstrate that questions of fact precluded summary judgment,

---

2The expert references "the hospital's" financial interests, but does not mention Dr. Gerety's or NMHI's financial interests.

Plaintiffs assert that "[t]he facts in dispute regarding the financial motive are identical to the facts in dispute regarding block times." In support, Plaintiffs cite their response to PHS's financial motives motion in its entirety. We decline to address this argument because (1) we generally do not address arguments raised for the first time in a reply brief and (2) "[g]eneral assertions of the existence of a triable issue are insufficient to overcome summary judgment on appeal." *Guest v. Berardinelli*, 2008-NMCA-144, ¶¶ 35-36, 145 N.M. 186, 195 P.3d 353. Plaintiffs fail to identify which of the thirty pages cited demonstrates evidence of a disputed fact and fail to address the factual basis of PHS's financial motives motion: that PHS did not participate in the decision to schedule Miller's surgery at all, which Plaintiffs did not dispute. "We will not search the record for facts, arguments, and rulings in order to support generalized arguments." *Firstenberg v. Monribot*, 2015-NMCA-062, ¶ 26, 350 P.3d 1205 (internal quotation marks and citation omitted).

**{32}**   Next, we address Plaintiffs' assertion that the district court improperly granted PHS's motion for summary judgment on block times. This motion (the block times motion) addressed Plaintiffs' contention that "the scheduling of . . . Miller's surgery . . . was []related to [NMHI's] operating room block times with PHS." PHS argued that there was no factual dispute that Miller's surgery occurred outside of NMHI's scheduled block times and sought a judgment that "NMHI's block times were unrelated to the scheduling of . . . Miller's surgery."

**{33}**   Plaintiffs' briefing of this issue is again frustratingly presented. While the district court initially granted PHS's block times motion, it subsequently granted Plaintiffs' motion to reconsider, thereby effectively denying PHS's motion. Thus, to the extent Plaintiffs argue that the block times motion was improperly granted in the first instance, we decline to address that issue. Instead, as we understand it, Plaintiffs' argument boils down to this: Although the district court ultimately denied PHS's block times motion because there was a genuine issue of material fact, it "reversed" its position when it prevented Plaintiffs from admitting evidence at trial related to block times. Plaintiffs maintain that the district court's "reversals" prejudiced them because they made an argument about the use of block times in opening argument but then were prevented from producing evidence to support it. Thus, despite Plaintiffs' presentation in their brief, their argument is less about the district court's summary judgment ruling (which ended in Plaintiffs' favor) than it is about the district court's subsequent inconsistent evidentiary ruling.

**{34}**   The evidence Plaintiffs sought to admit was a letter written by PHS's scheduling department manager regarding "the block time . . . reserved for [Dr. Gerety] in [PHS's] Main Operating Room" at the time of Miller's surgery. Although PHS relied on the letter to argue that Miller's surgery undisputedly took place outside of NMHI's block times and published the letter to the jury during its opening argument, Defendants objected to Plaintiffs' admission of the letter on the grounds that it lacked a proper foundation or was hearsay, irrelevant, and inadmissible under Rule 11-403 NMRA. The district court sustained Defendants' objection, telling Plaintiffs' counsel, "I think that you are, for some reason, making an issue up, that you don't need to make up, and it, it's misleading," and

asking, "why are you trying to confuse the jury with this?" *See* Rule 11-403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

**{35}** We review a district court's evidentiary rulings for an abuse of discretion. *Kysar v. BP Am. Prod. Co.*, 2012-NMCA-036, ¶ 20, 273 P.3d 867. However, "even if a district court makes an erroneous evidentiary ruling, it does not constitute reversible error unless it results in prejudice." *Id.* ¶ 21; *see* Rule 11-103(A) NMRA ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party."). Plaintiffs contend that the district court's ruling was prejudicial as a matter of law and rely on three federal criminal cases for the proposition that "[p]romising a particular type of [evidence] creates an expectation in the minds of jurors, and when . . . counsel without explanation fails to keep that promise, the jury may well infer that the [evidence] would have been adverse to his client and may also question the attorney's credibility." *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 259 (7th Cir. 2003); *see United States v. Gonzalez-Maldonado*, 115 F.3d 9, 14 (1st Cir. 1997); *Anderson v. Butler*, 858 F.2d 16, 17, 19 (1st Cir. 1988), *aff'd sub nom. Commonwealth v. Anderson*, 563 N.E.2d 1353 (Mass. 1990). Plaintiffs' reliance on these cases is misplaced. First, federal court decisions are not binding on this Court. Second, two of the cited cases address the issue in the context of ineffective counsel in criminal prosecutions, which involves a specific analysis not applicable here. Most importantly, however, none of the cases cited hold that a party is prejudiced whenever evidence it promised in opening was not presented at trial. Instead, each of these cases considers the prejudice to the offering party in the context of the rest of the evidence and the importance of that evidence to the offerer's case, as well as other factors. In *Hampton*, for example, the Seventh Circuit noted that the attorney's "breach of the promises he made in the opening statement was not so prejudicial that it would support relief in and of itself" and went on to examine the failure to present the promised evidence in light of "the more important failure to investigate exculpatory occurrence witnesses." 347 F.3d at 260; *see Anderson*, 858 F.2d at 17, 19 (considering the time elapsed between the promise and the end of the defendant's case (one day), the importance of the promised psychiatric evidence to the defense (high), and the fact that the idea of psychiatric evidence had been raised in voir dire as well as opening argument); *Gonzalez-Maldonado*, 115 F.3d at 15 (considering the reason the evidence was not presented and stating that since "the jury [was not] informed of the fact that it was the court's ruling, rather than the defendants' decision, that kept [the expert] off the stand[,]" the jury "was likely to infer from defense counsel's failure to call [the expert] that he was unwilling to testify for the defense").

**{36}** Contrary to Plaintiffs' suggestion, *Hampton*, *Anderson*, and *Gonzalez-Maldonado* demonstrate that the impact of the breach of a promise depends on the specificity of the promise, the importance of the promised evidence to the case, the length of the trial, the reason for the failure to present the promised evidence, and whether the jury was made aware of the reason. On appeal, a party arguing for reversal on this basis must address

the promise in the context of the entire trial. Plaintiffs do not do so, and this Court will not search the record for them. *Firstenberg*, 2015-NMCA-062, ¶ 26 ("We will not search the record for facts, arguments, and rulings in order to support generalized arguments." (internal quotation marks and citation omitted)).

{37} However, several facts here lessen any possible prejudice to Plaintiffs. First, because the district court excluded the exhibit after Defendants' objection, it was clear to the jury that it was the district court's decision, not a decision by Plaintiffs' counsel that prevented admission of the letter. This fact precluded any inference the jury might have drawn that Plaintiffs' counsel chose not to present the letter because it did not support Plaintiffs' case. *See Gonzalez-Maldonado*, 115 F.3d at 15 (noting that prejudice arose because the jury did not know that it was the district court's ruling that precluded admission of the promised evidence). Second, six days elapsed between opening argument and the jury's deliberations, which reduced the impact of the promise. *Cf. Anderson*, 858 F.2d at 17 (noting that only one day passed between the promise and jury deliberations). Third, in making its initial ruling to permit the block times issue to go to the jury, the district court stated that it "w[ould] prevent [block time evidence] from being used if it is not appropriate." Finally, both PHS and NMHI sought through various pre-trial motions to prevent admission of block times evidence, indicating that it was a hotly contested issue. Both of these facts put Plaintiffs on notice of the dangers of promising that evidence in opening argument. *Cf. Kysar*, 2012-NMCA-036, ¶ 23 (stating that "[i]t is often impossible to make definitive evidentiary rulings prior to trial because admissibility will depend on the state of the evidence at the time of the ruling" and that the context at trial "may demonstrate that excluded evidence is, in fact, relevant and admissible, making it proper for the district court to revisit, and modify or reverse its prior ruling" (internal quotation marks and citation omitted)).

{38} In sum, Plaintiffs do not present a reviewable issue as to the district court's grant of summary judgment to PHS on its financial motives and block times motions. In addition, even if the district court erred in excluding the letter regarding block times from evidence, Plaintiffs have failed to demonstrate that the ruling prejudiced them. In the absence of such a showing, we will not reverse on this ground. *Hartman v. Texaco Inc.*, 1997-NMCA-032, ¶ 25 n.4, 123 N.M. 220, 937 P.2d 979 ("An assertion of prejudice is not a showing of prejudice. In the absence of prejudice, there is no reversible error." (internal quotation marks and citation omitted)).

## D.     Admission of the Endocrinologist's Note

{39} Plaintiffs next argue that they "were severely prejudiced when they could not use [a medical note made by an endocrinologist the day after Miller's surgery] during the testimony of both of their experts or with Dr. Gerety[.]" In that note, the endocrinologist wrote that Miller's "diabetes was poorly controlled with a HgbA1C of 8.6 during this admission." Plaintiffs argued that this evidence was relevant to rebut Dr. Gerety's testimony that Miller's diabetes was "reasonably well controlled" at the time of surgery. Plaintiffs sought to admit the note three times; the district court denied its admission on the ground that it was an improper new opinion by an expert, that it was hearsay, and

that it was cumulative and prejudicial, respectively. In addition to arguing that the district court's rulings were correct, NMHI argues that Plaintiffs have failed to demonstrate prejudice resulting from the district court's rulings. Again, we agree. *See Kysar*, 2012-NMCA-036, ¶ 21 ("[E]ven if a district court makes an erroneous evidentiary ruling, it does not constitute reversible error unless it results in prejudice.").

**{40}** Ultimately, Plaintiffs admitted the note into evidence during their examination of PHS's corporate representative in their case in chief on the fifth day of trial. Thereafter, Plaintiffs used the note to cross-examine two of Defendants' witnesses and referenced the note in their closing arguments. The note was included in the exhibits sent to the jury room. On appeal, Plaintiffs assert that the inability to admit the note through their own expert was prejudicial because PHS's corporate representative was a hostile witness and "allowing a hostile witness to discuss a record is very different than allowing [Plaintiffs'] experts the same courtesy." While we agree with that general proposition, Plaintiffs do not explain *how* their experts' testimony would have differed had the note been admitted earlier in their case. Plaintiffs' bare assertion is insufficient to demonstrate prejudice, particularly given the subsequent admission of the note and its use by Plaintiffs during later cross-examination and closing argument. *Hartman*, 1997-NMCA-032, ¶ 25 n.4 ("An assertion of prejudice is not a showing of prejudice." (internal quotation marks and citation omitted)).

**{41}** Plaintiffs also argue that the district court "would not allow Plaintiffs to make an offer of proof [regarding the endocrinologist's note] through [their expert]" and "prematurely" cut short their offer of proof through Dr. Gerety. The record does not support either of these assertions and we decline to address them.

## E.    Directed Verdict in Favor of PHS

**{42}** At the conclusion of Plaintiffs' case in chief, the district court granted PHS's motion for directed verdict on the claims against it. "A directed verdict is a drastic measure that is generally disfavored inasmuch as it may interfere with the jury function and intrude on a litigant's right to a trial by jury." *McNeill v. Rice Eng'g & Operating, Inc.*, 2003-NMCA-078, ¶ 31, 133 N.M. 804, 70 P.3d 794 (internal quotation marks and citation omitted). "Hence, a directed verdict is appropriate only when there are no true issues of fact to be presented to a jury, and it is clear that the facts and inferences are so strongly and overwhelmingly in favor of the moving party that the judge believes that reasonable people could not arrive at a contrary result." *Id.* (internal quotation marks and citation omitted). On appeal, "we consider all evidence that has been properly admitted at trial, as well as all reasonable inferences deducible therefrom, resolving any conflicts or contradictions in the evidence in a light most favorable to the party resisting the motion" and "review de novo the question whether sufficient evidence exists as a matter of law to justify a verdict in one party's favor." *Id.*

**{43}** Plaintiffs argue that the district court should have denied PHS's motion for directed verdict because PHS (1) failed to enforce its Pre-Anesthesia and Surgical Screening Guidelines (PASS) for pre-surgical testing; (2) inaccurately informed Dr.

Gerety of Miller's blood glucose level before surgery; and (3) was negligent in permitting Miller's surgery to proceed on February 1, 2013. As to the first argument, Plaintiffs maintain on appeal that there was sufficient evidence to demonstrate that PHS was negligent in not enforcing its PASS guidelines and, therefore, to survive a motion for directed verdict. Plaintiffs acknowledge that defense witnesses testified that the PASS guidelines were advisory, not mandatory, but argue that "[t]he contradiction . . . [between] the mandatory language of the PASS policy compared to PHS's position that the policy was optional[] created an inference that PHS was negligent." Plaintiffs point to the word "will" in the guidelines as evidence that the procedures therein are mandatory. That language provides, for example, that "a Capillary Glucose *will* be obtained and the results *will* be treated by the anesthesia provider according to the [scale in the PASS guidelines]." (Emphasis added.) Importantly, Plaintiff does not direct us to any evidence or authority suggesting that, even if the PASS guidelines are mandatory, PHS's failure to enforce them would fall outside the standard of care. *Cf. Grassie*, 2011-NMCA-024, ¶ 77 ("Mere failure to act in accordance with one's own internal procedures, however, will not automatically thereby render a health care facility negligent." (quoting *Titchnell v. United States*, 681 F.2d 165, 173 (3d Cir. 1982)). Indeed, Plaintiffs' expert testified that he had reviewed the PASS guidelines and had no opinion about PHS's negligence based on the guidelines. Plaintiffs seek to undermine the expert's testimony by arguing that the expert was not aware that PHS had "disavowed" the PASS guidelines by considering them permissive. However, Plaintiffs fail to direct our attention to any evidence showing whether the expert believed the PASS guidelines were mandatory or permissive at the time he testified, or that he would have changed his opinion based on that knowledge. We conclude that the district court did not err in granting PHS's directed verdict motion on this ground because there was no testimony supporting Plaintiffs' claim that PHS staff negligently failed to follow the PASS guidelines.

{44}   Plaintiffs next argue that directed verdict was improper as to their claim that PHS nurses negligently communicated an incorrect blood glucose level to Dr. Gerety prior to surgery. Dr. Gerety did testify that a nurse told him that Miller's blood glucose was 103 mg/dl before surgery, but later retracted this statement, explaining that he could not find that value in the medical records and that his earlier testimony should be disregarded. Plaintiffs maintain that Dr. Gerety's initial testimony presents a triable issue that the jury should have decided. However, since Dr. Gerety testified that none of Miller's pre-surgery blood glucose levels caused him to consider postponing the surgery, and that Miller's blood glucose level was 142 mg/dl just prior to surgery, we fail to see how a report by PHS nurses of a *lower* glucose level would have changed Dr. Gerety's decision to continue Miller's valve replacement.

{45}   In a single sentence, Plaintiffs assert that a directed verdict as to PHS's negligence was improper because their expert "testified that PHS was negligent" and the district court "had no basis to ask the jury to disregard [the expert]'s opinion." The exchange referenced was as follows.

> Q: So, it's also been alleged in this case that . . . Miller's infection was merely a complication from surgery. So, first of all, does it make sense for

something to be too far removed from the surgery to be related but also a foreseeable complication that occurs all the time? Does that make any sense?

A: Yeah, no, and I think that's what, I would assume, the opposing side is trying to, I feel, pull over. I mean, you can't have it both ways. You can certainly have a complication from surgery that's nobody's fault. But this is one complication that in my opinion is clearly due to *negligence on the part of the surgeon and the part, I think, the part of the hospital as well*.

PHS immediately objected to this statement and argued that the expert's opinion that PHS was negligent was an improper undisclosed new opinion. The district court agreed and instructed the jury to disregard the statement as to PHS.

**{46}** Plaintiffs appear to concede that, in the absence of expert testimony that PHS was negligent, a directed verdict was proper and focus their attention on the district court's exclusion of the expert's opinion about PHS. In support of their argument that the expert's statement was not an undisclosed new opinion, Plaintiffs cite the expert's deposition, discussed more fully above, in which he stated that the timing of the surgery made him "think that . . . the hospital did not want to lose that slot for financial reasons" and that "if that was looked into, that could probably be substantiated[.]" Assuming that the expert's statement that PHS was negligent was based on his opinion about PHS's financial motives, as Plaintiffs suggest, we conclude that the district court properly struck the expert's testimony based on PHS's financial motives because we have affirmed the district court's grant of summary judgment to PHS on its financial motives for Miller's surgery. There being no other expert testimony that PHS was negligent, we affirm the directed verdict on this issue. *See Freeman v. Fairchild*, 2018-NMSC-023, ¶ 30, 416 P.3d 264 ("Under the right for any reason doctrine, an appellate court may affirm a district court ruling on a ground not relied upon by the district court if (1) reliance on the new ground would not be unfair to the appellant, and (2) there is substantial evidence to support the ground on which the appellate court relies." (alterations, internal quotation marks, and citation omitted)).

## F.     Cumulative Error

**{47}** Plaintiffs maintain that the district court's rulings, considered together, deprived them of a fair trial such that reversal is required, even if each alleged error is not reversible on its own. *See Coates v. Wal-Mart Stores, Inc.*, 1999-NMSC-013, ¶ 57, 127 N.M. 47, 976 P.2d 999 ("Reversal may be required when the cumulative impact of errors during a trial is so prejudicial that a party was denied a fair trial."). For the most part, Plaintiffs point to the alleged errors already discussed and reiterate their arguments that these errors, independently or cumulatively, require retrial. As already stated, we conclude that those alleged errors were not preserved, are inadequately raised on appeal, or do not rise to reversible error. Nor do the errors properly preserved and addressed on appeal rise to cumulative error when considered together. To the extent Plaintiffs assert in this section that the district court erred in ways not already

addressed, we decline to reach these arguments because they are inadequately briefed. "We will not review unclear arguments, or guess at what [Plaintiffs'] arguments might be." *Headley*, 2005-NMCA-045, ¶ 15.

## G.    Directed Verdict in Favor of NMHI

**{48}**    Finally, Plaintiffs argue that the district court erred in granting a directed verdict in favor of NMHI on the issue of punitive damages. Given our conclusion that no reversible error occurred that would require retrial, we conclude that this issue is moot because the jury found that Dr. Gerety, and therefore NMHI, was not negligent and did not award any compensatory damages. In the absence of a finding of negligence, there is no basis for punitive damages. *See Encinias v. Whitener Law Firm, P.A.*, 2013-NMSC-045, ¶ 21, 310 P.3d 611 ("[N]ominal and punitive damages are not available in a negligence action absent proof of actual damages."); *see also* UJI 13-1827 NMRA ("[The jury] may consider punitive damages only if [it] find[s] that [the party making the claim] should recover compensatory . . . damages.").

**{49}**    In sum, we see no basis for reversal of the district court's rulings or for a new trial, and turn next to Defendants' appeal of the district court's rulings on costs.

## II.    NMHI and PHS Appeal of Costs

**{50}**    After the trial concluded, both NMHI and PHS filed motions for recovery of their costs. Plaintiffs objected to certain costs as unreasonable or not permitted by statute. Plaintiffs also asserted that they "simply cannot pay costs to [Defendants] because they have no assets to do so. Both [Plaintiffs] are disabled and have a very fixed, limited income. Plaintiffs respectfully request that the [c]ourt consider the financial hardship of [Plaintiffs], and . . . use its discretionary authority to not tax costs against [Plaintiffs] in this matter." However, Plaintiffs did not attach any affidavits or documentation of their finances.

**{51}**    The district court held a hearing on Defendants' requests for costs on November 7, 2017. Plaintiffs' counsel appeared by telephone but the connection was so poor that she often could not be heard or understood, and the district court later referred to the November hearing as a "non-hearing." Plaintiffs requested an evidentiary hearing to demonstrate financial hardship. Defendants objected on the ground that Plaintiffs had failed to attach any evidence of hardship to their responses. At the end of the nine-minute hearing, the district court took the motions and Plaintiffs' request for a hearing under advisement. A few weeks later, the district court issued a letter decision, in which it stated:

> As prevailing parties, Defendants are entitled to an award of costs which are reasonable. I am sympathetic to Plaintiffs' claim of indigency; however, they have not provided me with evidence of indigency other than counsel's assertion that they live on fixed disability incomes. Without

evidence of Plaintiffs' income and resources I simply cannot reduce the award on that basis.

The district court also stated that it would disallow certain costs from Defendants' requests. In total, the district court's letter decision assessed costs against Plaintiffs in the amount of approximately $61,000. The district court did not address Plaintiffs' request for an evidentiary hearing. It closed by ordering "Defendants' counsel [to] prepare the orders for entry."

{52} After Defendants prepared their proposed orders for the district court, Plaintiffs objected and filed their own proposed orders. They also requested permission to file a motion for reconsideration under seal with documentation of their finances. The district court held a hearing on the proposed orders and Plaintiffs' request, at which Plaintiffs pointed out that the district court had not ruled on their request for an evidentiary hearing to demonstrate Plaintiffs' indigency. At the conclusion of the hearing, the district court stated that it would (1) enter the proposed orders submitted by Defendants, with minor adjustments, (2) grant Plaintiffs' request to file a motion for reconsideration under seal, and (3) hold a hearing on the motion to reconsider after briefing was complete.

{53} In support of their motion for reconsideration, Plaintiffs attached an affidavit by Cathie Miller and an ex parte letter from Cathie Miller to the district court judge describing their finances and requesting relief from the cost award. They also submitted copies of three rent checks, social security benefits statements for 2016, and correspondence from the Internal Revenue Service (IRS) regarding a tax lien, and account statements for three bank accounts. After a hearing on the motion, the district court entered an order stating "that Plaintiffs' [m]otion is well take[n] and should be GRANTED based on the disparity of wealth among the parties and in the interests of justice."

{54} On appeal, NMHI and PHS make essentially the same three arguments. They first contend that the district court should not have considered Plaintiffs' motion for reconsideration because it was not based on "newly discovered evidence." *See* Rule 1-060(B)(2) NMRA (permitting relief from a judgment or order based on "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial"). They also argue that (1) the district court improperly considered the relative wealth of the parties and (2) the evidence adduced by Plaintiffs was inconclusive as to Plaintiffs' finances.

## A.    Appropriateness of the Reconsideration

{55} In essence, Defendants argue that the district court improperly heard Plaintiffs' motion for reconsideration because the motion included evidence that Plaintiffs could and should have attached to their initial objections to Defendants' requests for costs. We review the district court's decision to grant or deny a motion for reconsideration only for an abuse of discretion. *Unified Contractor, Inc. v. Albuquerque Hous. Auth.*, 2017-NMCA-060, ¶ 77, 400 P.3d 290. We discern no abuse of discretion here.

**{56}** First, although Defendants rely on Rule 1-060(B)(2), we construe Plaintiffs' motion for reconsideration as falling within Rule 1-059(E) NMRA because Plaintiffs filed it within thirty days of the district court's cost orders. *See* Rule 1-059(E) ("A motion to alter, amend, or reconsider a final judgment shall be filed not later than thirty (30) days after entry of the judgment."). Under that rule, "[t]here is no abuse of discretion for the trial court to consider new material as part of a motion for reconsideration under Rule [1-0]59 as long as the delay in presenting the new material is not just for strategic reasons, and its relevance outweighs any prejudice." *In re of Estate of Keeney*, 1995-NMCA-102, ¶ 12, 121 N.M. 58, 908 P.2d 751.

**{57}** Seeking to distinguish *Keeney*, NMHI argues that Plaintiffs "made a strategic decision to withhold evidence of financial hardship until the district court ruled against them." But it does not explain what strategy was served by withholding such evidence. Nor do we see a strategic purpose in Plaintiffs' actions: Plaintiffs requested an evidentiary hearing on financial hardship *before* the district court issued its letter decision, not after. NMHI also argues that it was prejudiced because Plaintiffs' delay in adducing this evidence prolonged the litigation. However, we conclude that any prejudice to NMHI did not outweigh the relevance of the evidence to the district court's decision. *See id.* (stating that it is not error to consider new evidence where its relevance outweighs the prejudice to the non-movant).

**{58}** To the extent Defendants argue that our courts have held categorically that "motions to reconsider should not be used to relitigate previously determined issues or present documents that should have been submitted earlier," this is an overstatement of the holdings in those cases. In fact, those courts held only that the district court did not abuse its discretion by declining to hear a motion for reconsideration that raised new arguments and adduced evidence. *See Unified Contractor, Inc.*, 2017-NMCA-060, ¶ 78 (finding no abuse of discretion in denying reconsideration where the motion for reconsideration reiterated arguments already made to the district court); *Nance v. L.J. Dolloff Assocs., Inc.*, 2006-NMCA-012, ¶ 25, 138 N.M. 851, 126 P.3d 1215 (finding no abuse of discretion in denying reconsideration where the movant raised a new argument and evidence in support of it in a motion for reconsideration); *Deaton v. Gutierrez*, 2004-NMCA-043, ¶ 9, 135 N.M. 423, 89 P.3d 672 (finding no abuse of discretion in denying reconsideration where the omission of documents in prior proceedings appeared to have been purposeful). They do not stand for the opposite proposition: that a district court abuses its discretion whenever it hears a Rule 1-059(E) motion for reconsideration that presents evidence that could have been adduced earlier.

**{59}** We conclude that there was no abuse of discretion under the facts here. First, Plaintiffs asserted financial hardship throughout litigation on Defendants' motions for costs. Second, as the district court acknowledged, the first hearing on costs was cut short because of difficulties with the telephonic appearance of Plaintiffs. Third, the district court's letter decision, which was not a final order, was based on Plaintiffs' failure to adduce evidence even though the district court did not rule on Plaintiffs' request to introduce evidence about their financial straits. *See Moffat v. Branch*, 2002-NMCA-067, ¶ 23, 132 N.M. 412, 49 P.3d 673 (stating that a letter decision was not a final order

where it "[did] not include decretal language and specifically instruct[ed] counsel to prepare a final order"). We see no abuse of discretion in the district court's decision to rectify that oversight by permitting Plaintiffs to present evidence it specifically stated would be germane to its final decision. Finally, the district court entered the final cost orders with the express expectation that Plaintiffs would request reconsideration.

## B.    Considerations of the District Court

**{60}**    Defendants next argue that the district court improperly weighed the parties' ability to pay. They argue that there was no basis for the district court's determination that there was a "disparity of wealth between the parties" because there was no evidence presented as to Defendants' wealth. In addition, they contend that the relative wealth of the parties is not a proper consideration when determining cost awards.

**{61}**    Generally, "costs, other than attorney fees, shall be allowed to the prevailing party unless the court otherwise directs[.]" Rule 1-054(D)(1) NMRA. "[T]he phrase 'unless the court otherwise directs' states an equitable principle; and, subject to the exceptions imposed by the Rule, vests in the district court a sound discretion over the allowance, disallowance, or apportionment of costs in all civil actions." *Gallegos ex rel. Gallegos v. Sw. Cmty. Health Servs.*, 1994-NMCA-037, ¶ 29, 117 N.M. 481, 872 P.2d 899 (internal quotation marks and citation omitted). In *Gallegos*, this Court observed that "[t]he losing party may overcome the presumption in favor of awarding costs to the winning party by showing [among other things] . . . that an award would be unjust[.]" *Id.* (internal quotation marks and citation omitted). We noted that the "most common bases for denying costs to prevailing defendants have been the indigency of the losing plaintiff, coupled with good faith of the indigent and the non-frivolous nature of the case." *Id.* (internal quotation marks and citation omitted). However, "disparity of wealth between the parties, without additional evidence of the losing party's inability to pay or bad faith of the prevailing party, is not enough to justify a reduction in the cost award." *Key v. Chrysler Motors Co.*, 2000-NMSC-010, ¶ 15, 128 N.M. 739, 998 P.2d 575. In other words, "a party should not be denied an award of costs simply because it can afford to swallow the expense." *Id.* (internal quotation marks and citation omitted).

**{62}**    Contrary to Defendants' position, the district court did not base its decision solely on the relative wealth of the parties, despite its supplemental use of that phrase at the hearing and in the order. We "may consider the trial court's verbal comments in order to clarify or discern the basis for the order or action of the court below." *Jeantete v. Jeantete*, 1990-NMCA-138, ¶ 11, 111 N.M. 417, 806 P.2d 66. At the conclusion of the hearing, the district court noted that it never believed that Plaintiffs could afford the cost award and that statements in its letter decision were intended to convey the district court's concern about Plaintiffs' ability to pay. The district court noted that it "ha[d] the authority to deny a cost award when the party has a financial inability to pay." It also stated that "it is in the interest of justice given the relative wealth of the parties involved that even though New Mexico law allows the award of costs to the prevailing party in most instances, in this instance . . . I don't think the bringing of the law suit was in bad faith." The district court's repeated references to Plaintiffs' ability to pay and its

reference to Plaintiffs' good faith indicates that the district court properly considered those factors. *See Apodaca v. AAA Gas Co.*, 2003-NMCA-085, ¶¶ 105, 108, 134 N.M. 77, 73 P.3d 215 (affirming the denial of costs where the district court considered "the disparity of resources between the parties" but also considered "the other reasons advanced by [the p]laintiffs' counsel" (internal quotation marks and citation omitted)); *Gallegos*, 1994-NMCA-037, ¶ 29 (stating that an award of costs may be denied if the losing party is indigent and acted in good faith in pursuing a non-frivolous suit).

## C.      Sufficient Evidence

**{63}**     Finally, Defendants argue that "Plaintiffs failed to present evidence that is sufficient to overcome the presumption that [Defendants are] entitled to recover costs." *See May v. DCP Midstream, L.P.*, 2010-NMCA-087, ¶ 16, 148 N.M. 595, 241 P.3d 193 ("The language of [Rule 1-054(D)(1)] creates a presumption for an award of costs in favor of the prevailing party, and the burden is on the losing party to demonstrate circumstances that justify the reduction or denial of costs.").

**{64}**     In their motion for reconsideration, Plaintiffs submitted an affidavit in which Cathie Miller stated that both she and Miller had fixed income from the Social Security Administration (SSA) and retirement accounts, that they owed back taxes to the Internal Revenue Service and were still paying down a student loan, and that they would not be able to pay the cost award. Plaintiffs attached copies of their SSA statements showing their SSA income in 2016. They also attached bank statements for three accounts showing an average balance of less than $1,000. Finally, they attached an ex parte letter from Cathie Miller to the district court, which showed Miller's retirement income and stated that Plaintiffs were seventy-eight and seventy years old.

**{65}**     Defendants argue that this evidence was insufficient to show indigency because the affidavit "was not supported by tax returns or other similar, official documents to confirm Cathie Miller's claims that [Plaintiffs] did not have sufficient income to pay costs to the prevailing part[ies] in the litigation, or to prove that . . . Miller's previous income from photography was no longer available to [Plaintiffs]." Defendants do not explain why the district court should not consider a sworn affidavit, even when not accompanied by "official documents," and none of the cases they cited suggest that it would be error to do so. *See, e.g.*, *May*, 2010-NMCA-087, ¶ 17 (noting that the district court relied on the plaintiff's affidavit in its cost award determination). In any case, here, the affidavit *was* accompanied by documents reflecting Plaintiffs' bank accounts and SSA income. We conclude that the district court did not abuse its discretion in considering the affidavit as well as the other documentation submitted. "[T]he district court relied on facts in the record and came to a logical conclusion. We therefore conclude the district court did not abuse its discretion" in denying Defendants' motions for costs. *Id.*

**{66}**     Defendants' argument that Miller's deposition and trial testimony suggests that he has income not reflected in the affidavit and supporting documents does not change our conclusion. Because the district court addressed that testimony in its verbal ruling, it is clear that it weighed all of the evidence. We defer to the district court's credibility

determinations and resolution of conflicting evidence. *Sanders v. Rosenberg*, 1997-NMSC-002, ¶ 11, 122 N.M. 692, 930 P.2d 1144.

**{67}** We conclude that Defendants have not shown that the district court abused its discretion in considering Plaintiffs' motion for reconsideration or in analyzing the cost award, and that the evidence supports its determination that Plaintiffs were unable to pay the costs requested. We affirm the district court's denial of Defendants' requests for costs.

**Conclusion**

**{68}** For the foregoing reasons, there is no basis for reversal of the district court's rulings and we therefore affirm the jury's verdict in favor of Defendants. We also affirm the district court's denial of Defendants' motion for costs.

**{69}  IT IS SO ORDERED.**

**LINDA M. VANZI, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Judge**

**KRISTINA BOGARDUS, Judge**